[Civ. No. 2337. Fourth Appellate District.—July 21, 1939.]

AMERICA W. GRANT, Respondent, v. BARON LONG et al., Appellants.

Wright, Monroe, Harden & Thomas for Appellants.

Charles C. Crouch, George W. Crouch and O. A. Thorpe for Respondent.

MARKS, J.—This is an action for declaratory relief, and certain defendants have appealed from the judgment giving plaintiff the right to the free use of an apartment in the U. S. Grant Hotel in San Diego and free service and meals and refreshments (not including alcoholic beverages) for herself and her guests during the remainder of her life.

Appellants' principal attack on the judgment is based on the insufficiency of the evidence to support the findings, and the insufficiency of the findings to support the judgment. To properly understand and consider the issues thus raised requires a somewhat detailed statement of the evidence. We will, however, largely disregard the sharp conflicts in the evidence and confine ourselves to a summary of that which supports the findings and judgment.

Prior to 1909, U. S. Grant, Jr., owned an eleven-story hotel building on property facing on Broadway, between Third and Fourth Avenues, in the city of San Diego. In May, 1909, the U. S. Grant Hotel and Office Building Company was organized. We will hereafter refer to this corporation as the Hotel Company. In June, 1909, U. S. Grant, Jr., conveyed

the hotel property to the Hotel Company which has owned it ever since.

U. S. Grant, Jr., owned 16,000 shares, being all the issued capital stock of the Hotel Company, from which certain qualifying shares were issued to certain directors. In hereafter noting the various changes in ownership of the stock we will not take into consideration the qualifying shares standing in the names of directors but actually owned by others.

A bond issue in the sum of $600,000 was secured by a first lien on the hotel property. A second bond issue in the sum of $1,000,000 was secured by a second incumbrance on the property. A relatively small amount of these second mortgage bonds had been sold to the public. The balance of them, over $900,000 in par value, were owned by U. S. Grant, Jr. These bonds were regarded as an adjunct to ownership of the stock. When a sale of stock was made it carried with it a transfer of an equal proportionate amount of the bonds.

Shortly after the incorporation of the Hotel Company, the U. S. Grant Company was organized. It was a family estate company, used for the purpose of holding the property of U. S. Grant, Jr., for the protection of his children, the issue of a marriage prior to his marriage to America W. Grant.

Prior to April 27, 1910, the Grant-Holmes Hotel Operating Company was organized. On that date it was given a lease on the hotel property, with the exception of some first floor stores. It was given a second lease for thirteen years on October 11, 1917. This lease did not contain any reservations of any hotel rooms. This company continued to operate the hotel until 1921, when it was seemingly permitted to go out of existence. The lease seems to have been abandoned by common consent.

U. S. Grant, Jr., was president and director of the Hotel Company, and of the U. S. Grant Company, up to the time of his death on September 26, 1929. He held the same positions in the Grant-Holmes Hotel Operating Company until it passed from the picture.

U. S. Grant, Jr., married America W. Grant in 1913. Shortly after their marriage they occupied a suite in the U. S. Grant Hotel. After a few years this suite was enlarged. They continued to occupy it until the death of Mr. Grant. They spent about $4,000 in remodeling four hotel rooms into a convenient living apartment which was separated from the

balance of the hotel. Mr. and Mrs. Grant were charged no rent for their apartment and were furnished free service and free meals and refreshments for themselves and their guests. After the death of Mr. Grant, Mrs. Grant continued to occupy the apartment and received like accommodations and service without charge. On March 11, 1935, the board of directors of the Hotel Company passed a resolution permitting her to use her apartment free of rent and allowing her complimentary charges of twenty-five dollars a week in lieu of the previous service of unlimited free meals and refreshments for herself and her guests. This was occasioned by the sudden growth of Mrs. Grant's complimentary charges. In 1932 and 1933, they averaged about $750 per year for meals and refreshments. In January, 1935, her service for wines and liquors alone amounted to $198.55, and in February of that year, to $204.04.

This action on the part of the Hotel Company precipitated a controversy with Mrs. Grant. She maintained that what she had been receiving from the Hotel Company was a matter of right based on contract. The Hotel Company claimed it was a matter of accommodation under a revocable license.

In March, 1936, the Hotel Company caused Mrs. Grant to be notified that thereafter she would be charged $350 per month rent for the apartment and the value of the meals and refreshments furnished to her or her guests. This action followed.

After a protracted trial the court found that Mrs. Grant had a legally established right to the free use of the apartment and to free service, meals and refreshments, not including alcoholic beverages, for herself and her guests during the rest of her life. This appeal followed.

We must summarize the transfers of the stock and the second mortgage bonds of the Hotel Company in order to give a proper picture of the transactions which the trial judge took into consideration in rendering his judgment.

Mrs. Grant testified that in 1914, or 1915, she purchased from her husband, for $80,000, one-half of the issued stock and one-half of the second mortgage bonds of the Hotel Company which were owned by him. On a statement prepared by an officer of the Hotel Company early in 1925, which showed the interest payments upon and ownership of these bonds, U. S. Grant, Jr., wrote the following: "U. S. Grant

Jr.'s ¼ long since transferred to America W. Grant. U. S. Grant, Jr.'' This statement was produced from the files of the Hotel Company.

No stock was transferred of record to the name of Mrs. Grant until August 12, 1920, when a certificate for five shares was issued to her. On March 8, 1923, a certificate for 3,997 shares was issued to U. S. and America W. Grant. On December 26, 1925, this certificate was canceled and one for 3,998 was issued to America W. Grant.

In 1914, 8,000 shares of the capital stock of the Hotel Company was issued to the U. S. Grant Company. This carried ownership of a proportionate share of the second mortgage bonds.

In the fall of 1919 Baron Long and E. L. Potter purchased from Barker, Holmes, the Barker Company, and U. S. Grant, Jr., stock of the Grant-Holmes Hotel Operating Company which equalled one-half of the issued stock of that company. The other half of the stock stood in the name of U. S. Grant, Jr.

Baron Long took over the active management of the hotel for the Grant-Holmes Hotel Operating Company in 1919, or 1920.

At the time of this transfer of ownership and management, U. S. Grant, Jr., discussed with Baron Long the continuance of the use of the hotel apartment by himself and Mrs. Grant. Mr. Long testified that he replied to the questions of Mr. Grant as follows: ''I said, 'You are president of this company, Mr. Grant, and that entitles you to all privileges here.' And I added: 'In addition I would consider you a great asset to this company.' ''

Probably in 1920, Baron Long began negotiations for the purchase, by himself and E. L. Potter, of one-half of the stock in the Hotel Company, including a proportionate share of the second mortgage bonds. On October 4, 1920, certificates for 4,000 shares each were issued to Baron Long and E. L. Potter. Mr. Long was continued in his position as active manager of the hotel. He also became a director of the Hotel Company.

In 1921, a plan for the retirement of the second mortgage bonds was inaugurated. A trust was established with The Southern Trust and Commerce Bank as trustee, since absorbed by the Bank of America National Trust and Savings Associa-

tion (hereinafter called The Bank), in which all bonds owned by the stockholders of the Hotel Company were deposited. The trust agreement bears the date of April 7, 1921, and contains the following:

"Now, Therefore, It is Mutually Agreed between the undersigned as follows:

"(a) These bonds are to remain in trust with the Southern Trust and Commerce Bank until the 1st day of July, 1930, which is the date of the expiration of the first mortgage bonds. On the last mentioned date all of the aforesaid second mortgage bonds, together with all unclipped and unpaid, or unpaid, coupons, are to be turned over to the U. S. Grant Hotel & Office Building Company free of charge.

"(b) During the life of said trust and until the said first day of July, 1930, any of the due coupons, or past due coupons, which the company is able to pay are to be distributed to the various stockholders who have subscribed to this memorandum of agreement, in proportion to the bonds held by each of said stockholders.

"In Witness Whereof we have hereunto set our hands the day and year first above written.

| | Amt. of bonds |
|---|---|
| BARON LONG | $121,875. |
| MARTHA LONG | $121,875. |
| E. L. POTTER | $243,750. |
| U. S. GRANT CO. | $243.750. |
| By U. S. GRANT Jr., Pres. | |
| U. S. GRANT, Jr. | $243,750." |

This trust, through subsequent purchases, acquired others of these bonds so that the bonds held by the trust had a total par value of $999,000.

Under date of January 16, 1926, the U. S. Grant, Jr., Trust was organized. This trust held all of the stock and interest in the second mortgage bonds of the Hotel Company belonging to U. S. Grant, Jr., and America W. Grant. It was executed by U. S. Grant, Jr., and his children and America W. Grant, who were the beneficiaries with certain grandchildren of U. S. Grant, Jr. The Hotel Company was not a party to this trust. The declaration of trust created "the office or position of adviser and referee to the trustee" and named Baron Long to fill it. He acted in that capacity for some time. No investment of trust funds in excess of $900 could be made

by the trustee without the written consent of the "adviser and trustee".

The declaration of trust contained the following:

"U. S. Grant, Jr., and America W. Grant, husband and wife, also hereby sell, transfer, set over and convey to the Southern Trust and Commerce Bank, and its successor or successors, in trust nevertheless as provided in this trust agreement, second mortgage bonds of the U. S. Grant Hotel & Office Building Company of the par value of Two Hundred Forty-four Thousand Seven Hundred Fifty Dollars ($244,-750) ; together with their, and each of their interests in and to any and all like bonds hereafter acquired; subject, however, to the terms, covenants and conditions of a written agreement of the stockholders of the U. S. Grant Hotel & Office Building Company entered into under date of April 7, 1921, whereby Nine Hundred Seventy-five Thousand Dollars ($975,000.00), par value, of second mortgage bonds were placed in trust with the Trust Department of the Southern Trust and Commerce Bank, for purposes therein specifically set forth, and other bonds as acquired were to be placed in the same trust; and their present arrangement for residence of U. S. Grant, Jr., and America W. Grant in the U. S. Grant Hotel shall not, during their lifetime or the lifetime of either of them, be disturbed by the trustors or the Trustee."

At the time of the trial of this action the books of the Hotel Company showed the following ownership of its stock: U. S. Grant Company, 4,000 shares; U. S. Grant, Jr., trust, 4,000 shares; Baron Long, 4,000 shares; E. L. Potter, 4,000 shares.

The first mortgage bonds of the Hotel Company became due on July 1, 1930, with all or a large portion of them unpaid. The Hotel Company borrowed from The Bank, on its note secured by the second mortgage bonds, sufficient money with which to pay these first mortgage bonds. The second mortgage bonds are still security for its note on which there remains a balance of about $500,000 of unpaid principal.

The claim of Mrs. Grant to the free use of the hotel apartment, and to free service, meals and refreshments, is principally based on the conduct of the parties over a long period of years and on her testimony which was corroborated in several of its most important details by the evidence of other witnesses.

Mrs. Grant described a statement made by her husband in a conversation with her which occurred at the time of the transfer of stock to the U. S. Grant Company, as follows: "'Now as a matter of fact' he says, 'you have the other half interest in the U. S. Grant Hotel & Office Building·Company, it is your home, it is yours'—."

Mrs. Grant detailed a conversation with Baron Long in October, 1920, just before Long and Potter purchased stock in the Hotel Company, as follows:

"Mr. Long came up and the conversation was that the hotel was very much run down and it needed a great deal of repairing, and that he and his wife and Mr. Potter wanted to buy an interest in the U. S. Grant Hotel & Office Building, to which I objected, and he wanted to know why, what my objection was. I said, 'Well, Mr. Long,' I said, 'We cannot sell part of the hotel because this is our home; we cannot sell you an interest in the hotel because this is our home and one doesn't sell an interest in their home,' and he said, 'Well, now, Mrs. Grant', he said, 'I know this is your home; it always has been your home and it always shall be your home, no one shall ever disturb you,' he said, 'I speak for my wife, Mrs. Long and for Mr. Potter.' . . . He said, 'This is your home. It always will be your home, no one will ever disturb you in your home; things shall go on just as they are, Mrs. Grant; I speak for Mr. Potter and my wife.'"

A conference was held, probably very early in October, 1920, concerning the sale of the stock to Long and Potter. There were present, besides Mrs. Grant, Mr. Long, manager of the hotel, Mr. Grant, president and director, Mr. Thompson, director and assistant secretary, and Messrs. Wright and Hall, directors of the Hotel Company. Mrs. Grant testified that the details of the sale of stock were argued and discussed; that she said their home in the hotel must not be interfered with; that it must be understood that the Grants were to continue to have their home in the hotel; that Mr. Grant replied, "That is understood"; that no one present made any objection to that reply.

Mrs. Grant testified that when the second mortgage bonds were being deposited in the trust created by the agreement of April 7, 1921, she said to her husband: "It will not interfere with our home? We are to have our home here for life,

our maintenance?'' and that he replied, ''Yes, everything is arranged.''

Jack C. Thompson, a director and assistant secretary of the Hotel Company, admitted saying, in relation to the deposit of the second mortgage bonds in the trust of April 7, 1921, ''I think it was understood that U. S. Grant was to have the quarters in the hotel that were then specially fitted for them and their subsistence.''

Mrs. Grant also discussed the same subject with one of the directors of the Hotel Company at the time she signed the U. S. Grant, Jr., trust indenture in January, 1926. She testified that this director assured her that the right of Mr. Grant and herself to the free use of the apartment was fully protected. She also testified that at about this same time, in advising her to sign this trust indenture, Baron Long said, ''I think the set-up for you is very fine, . . . You have your home here, you have your food, you have your income for life and no one can touch your property. . . . I think it is a wonderful set-up.''

Shortly after the death of Mr. Grant, Baron Long said to Mrs. Grant, ''I do not know of anybody, of any woman sitting prettier than you are today; here you are, you have twenty-five thousand dollars a year income; you have your apartment; you have your maintenance for yourself and friends as long as you live.''

Mrs. Grant testified that ever since her marriage to Mr. Grant, the hotel had furnished ''room, the apartment, maid service, kitchen service and food'' without charge.

It is perfectly clear from the record that the officers and directors of the Hotel Company who were active in the management of its affairs knew that Mr. and Mrs. Grant were receiving, and after his death, Mrs. Grant was receiving free rent, hotel service, meals and refreshments. Appellants maintain that these services are customarily granted to the president of a hotel corporation; that after Mr. Grant's death they continued the free services to Mrs. Grant out of respect for the memory of her husband and because she was a large stockholder in the corporation. They urge that none of them had any knowledge or notice that either Mr. or Mrs. Grant claimed these services as a matter of right until in March, 1935.

Before passing to a discussion of the numerous legal questions ably presented by counsel we wish to state that the evi-

dence is hopelessly conflicting on the important issues of the case. The trial court accepted respondent's evidence as true. If that evidence sustains the findings and if the findings support the judgment, we cannot reverse it unless serious prejudicial errors occurred in the trial.

■ The first question argued is the nature of the estate, if any, acquired by Mr. and Mrs. Grant in the hotel property. Appellants urge that it could be nothing but a life estate in joint tenancy with the right of survivorship; that such an estate is an interest in real property which can only be created by an instrument in writing; that as the estate claimed by respondent is not supported by any writing the attempt to create it was void (sec. 1624, Civ. Code); that therefore Mrs. Grant had only a revocable license to enjoy such privileges as the Hotel Company might have chosen to extend to her.

Respondent suggests, rather than urges, that the evidence supports the conclusion that a trust in the apartment was created by operation of law; that the legal title remained in the Hotel Company subject to a vested right in Mr. and Mrs. Grant and, after Mr. Grant's death, in Mrs. Grant, as bene- ·ficiaries of the trust to have the free use and exclusive occupancy of the apartment.

We incline to the view that the estate attempted to be created, rather than being a vested life estate in joint tenancy, was a trust with a life estate in joint tenancy with the right of survivorship with Mr. and Mrs. Grant as beneficiaries. (Restatement of the Law of Trusts, vol. 1, pp. 149, 150; *Haskell* v. *First Nat. Bank,* 33 Cal. App. (2d) 399 [91 Pac. (2d) 934].) A discussion of the question of whether a vested life estate or a trust was created would be purely academic and of no effect on the real questions at issue. If a vested life estate was created it was in joint tenancy with the right of survivorship. If a trust was created it was for the benefit of Mr. and Mrs. Grant as joint tenants with the rights of survivorship. Both are estates in real property that could have been created only by instruments in writing unless the facts before us bring the case without the provisions of the statute of frauds.

■ Appellants urge that, given its greatest possible weight and effect, the evidence falls short of establishing any contract for the free use of the apartment and free service, meals and refreshments, upon which any life estate can be predi-

cated; that the Hotel Company was not in possession of and did not operate the hotel until 1921; that any conversations prior to that date concerning the apartment and service could only affect the Grant-Holmes Hotel Operating Company, the lessee, and could not create an interest in or place a burden on the property of the Hotel Company; that after that date the Hotel Company could not be bound by the acts or admissions of its officers or agents because no authority was given any of them to bind it; that while Mr. Grant was the president and director of the Hotel Company he was claiming an interest adverse to it; that an officer or agent of a corporation cannot, without express authority, create, by any act or failure to act, an estate in himself in the corporate property hostile and adverse to that of the corporation.

We are not inclined to place any serious reliance on the private conversations between Mr. and Mrs. Grant. However, the evidence does show that for over fifteen years Mr. and Mrs. Grant received, and for an additional five and one-half years Mrs. Grant has received the service she now claims. There is sufficient evidence in the record, which the trial judge accepted as true, to establish that Mrs. Grant claimed to officers and directors of the Hotel Company, other than her husband, the free use of the apartment and free service as a matter of right.

"A contract is either express or implied." (Sec. 1619, Civ. Code.) "An express contract is one, the terms of which are stated in words." (Sec. 1620, Civ. Code.) "An implied contract is one, the existence and terms of which are manifested by conduct." (Sec. 1621, Civ. Code.)

While an express contract is one, the terms of which are stated in words (*Treadwell* v. *Nickel*, 194 Cal. 243 [228 Pac. 25]), one party may use the words and the other may accept, either in words or by his actions or conduct. (*Lane* v. *Superior Court*, 104 Cal. App. 340 [285 Pac. 860].)

An implied contract is one that "is inferred from the conduct, situation or mutual relation of the parties and enforced by the law on the ground of justice". (*Jennings* v. *Bank of California*, 79 Cal. 323 [21 Pac. 852, 12 Am. St. Rep. 145, 5 L. R. A. 233].) "The making of an agreement may be inferred by proof of conduct as well as by proof of the use of words." (*Dunham-Carrigan & Hayden Co.* v. *Thermoid Rubber Co.*, 84 Cal. App. 669 [258 Pac. 663].)

"In general an implied contract, in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it, the substantial difference between the two being in the mere mode of proof by which they are to be respectively established. The law will imply that a party did make such a stipulation as under the circumstances disclosed, he ought, upon the principles of honesty, justice, and fairness to have made." (*Smith* v. *Moynihan,* 44 Cal. 53, at 62.) Of course, both kinds of contracts must be supported by adequate considerations. (Sec. 1605, Civ. Code.)

We must measure the facts before us by the foregoing simple and well-established rules of the law of contracts, which, while clear in themselves, are sometimes difficult to apply to an involved factual situation such as confronts us here.

In approaching this question it should be first clearly stated that the private conversations between Mr. and Mrs. Grant, upon which the latter in part relies to establish the contract, should be disregarded. While Mr. Grant was president and director of the three corporations involved, he was also receiving free rent of the apartment and free service and meals. Thus he was a beneficiary of any contract between himself and the corporations, or either of them, and himself. He should not be permitted to make any statement as president of a corporation that would bind it to him as the individual to benefit by it, without express and formal authority from the board of directors of the corporation. This he did not have. In other words, he, simply because he was an officer of a corporation, could not contract with himself as an individual and bind the corporation to give him, the individual, a valuable property right and valuable service over a period of years. To permit a corporate official to do so would open the door to fraud (not appearing here) and would permit an unscrupulous officer to despoil the corporation and its stockholders of the corporate assets. We will, therefore, eliminate from our consideration all conversations occurring between Mr. and Mrs. Grant not held in the presence of other corporate officials. By so doing plaintiff is forced to rely upon a contract implied from the conduct of the parties over a considerable number of years, the statements of the officers of the Hotel Company, and the knowledge of the Hotel Company of those dealings as shown by statements and admissions of its officers, other than Mr. Grant.

It cannot be doubted that Mr. and Mrs. Grant had been given the free use of their apartment, free service, meals and refreshments from 1914 to 1919, when Baron Long assumed the management of the hotel for the Grant-Holmes Hotel Operating Company. Baron Long continued this free service on the part of this operating company until January 1, 1921, when he took over the management of the hotel for the Hotel Company. Up to that time the accommodations were furnished by the operating company and not the Hotel Company. After that time they were furnished by the Hotel Company.

During the negotiations in 1920 for the purchase of one-half the stock and second mortgage bonds of the Hotel Company by Baron Long and E. L. Potter, Mrs. Grant made it clear that the free use of the apartment and free service, meals and refreshments were then claimed by Mr. and Mrs. Grant for the rest of their lives. Mr. Long agreed that these free accommodations would be continued. He knew just what had been furnished for he, as manager, had been furnishing that service for at least a year.

At the conference held in October, 1920, at which at least three directors of the Hotel Company, other than Mr. Grant, were present, it was made clear that the Grants were to continue to receive their free accommodations in the hotel. While it was Mr. Grant who replied to his wife, "That is understood," those present acquiesced in that reply by their silence.

We regard the signing of the trust agreement of April 7, 1921, and the conversations which occurred at that time as a most important factor in the case. One of the directors admitted that at that time it was understood that Mr. Grant was to have his quarters and subsistence in the hotel. With that understanding the trust agreement was signed and the Grants deposited $243,750, in par value of the second mortgage bonds in the trust, with the Hotel Company as the ultimate beneficiary. The Hotel Company now has those bonds. Those bonds, with others, are now used by the Hotel Company to secure its note for about $500,000.

That the Hotel Company, through its officers and directors, had full knowledge of the terms of the implied contract from the time it took over the management of the hotel on January 1, 1921, to March, 1935, cannot be doubted. It fully conformed to all of those terms and performed its obligations

during those fourteen years. By its performance it showed not only knowledge of the contract, its assent to all of its terms, but placed its practical construction on it. Where the terms of a contract are not clearly expressed in words the construction put upon them by the contemporaneous acts of the parties to it furnish a most reliable means of arriving at their intention in entering into it. (*Skousen* v. *Herz,* 135 Cal. App. 116 [26 Pac. (2d) 498].)

The testimony which we have quoted clearly shows that after January 1, 1921, the officers of the Hotel Company clearly recognized the binding effect of the contract. Their statements to Mr. and Mrs. Grant could have no other effect than that of lulling them into a sense of security and into a belief that there was a valid and binding contract for the free accommodations for themselves and the survivor of them. The Hotel Company, during all of that time, was the beneficiary of the trust of April 7, 1921. If it did not consider itself bound by the implied contract it should have spoken years ago when the claim of the accommodations as a matter of right became so apparent that it could not be doubted. If that time was not fixed by prior conversations and conduct it was fixed by the U. S. Grant, Jr., trust of 1926, for the declaration of trust contained a written acknowledgment that the claim was a claim of right. One of the directors of the Hotel Company prepared that document. Baron Long was named in it as "adviser and referee to the trustee" and acted as such. He advised Mrs. Grant to sign it. Baron Long and the director who prepared the declaration of trust are charged with notice of its contents and through them the Hotel Company is charged with like notice.

The Hotel Company still retains all the benefits it derived under the trust of April 7, 1921. It even now has made no offer to return any of the Grant bonds it received under it. It should not be permitted to retain all the benefits of its implied contract with Mr. and Mrs. Grant and repudiate its obligations under that contract.

 We must now consider the effect of the statute of frauds on the question of the validity of the implied contract we are considering.

It is a fundamental rule that as the statute of frauds is designed to prevent fraud it cannot be invoked to perpetrate a fraud. (*Seymour* v. *Oelrichs,* 156 Cal. 782 [106 Pac. 88,

134 Am. St. Rep. 154]; *Stepp* v. *Williams,* 52 Cal. App. 237 [198 Pac. 661]; *Tuck* v. *Gudnason,* 11 Cal. App. (2d) 626 [54 Pac. (2d) 88].) This rule is based on the doctrine of estoppel. It is applied in those cases in which one party, in reliance on a parol contract that should have been reduced to writing, has changed his position or parted with value so that it would be an injustice to permit the other party to plead the statute of frauds. This rule was announced in *Wilson* v. *Bailey,* 8 Cal. (2d) 416 [65 Pac. (2d) 770], as follows:

"It is, of course, well settled, under the provisions of section 1624 of the Civil Code and section 1973 of the Code of Civil Procedure, that certain contracts to be enforceable are required to be in writing, or that some note or memorandum thereof be in writing, subscribed by the party to be charged, or his agent. It is also equally well settled that the facts of a particular case may give rise to an equitable estoppel against the party seeking to set up the statute of frauds and foreclose such party from relying thereon. (*Seymour* v. *Oelrichs,* 156 Cal. 782 [106 Pac. 88, 134 Am. St. Rep. 154]; *Notten* v. *Mensing,* 3 Cal. (2d) 469 [45 Pac. (2d) 198].) . . .

"It was said in *Glass* v. *Hulbert,* 102 Mass. 24, 35 [3 Am. Rep. 418]: 'The fraud most commonly treated as taking an agreement out of the statute of frauds is that which consists in setting up the statute against its enforcement, after the other party has been induced to make expenditures, or a change of situation in regard to the subject matter of the agreement, or upon the supposition that it was to be carried into execution, and the assumption of rights thereby to be acquired; so that the refusal to complete the execution of the agreement is not merely a denial of rights which it was intended to confer but the infliction of an unjust and unconscientious injury and loss. In such case the party is held by force of his acts or silent acquiescence which have misled the other to his harm to be estopped from setting up the statute of frauds.' This statement has been accepted as setting forth a plain and satisfactory ground for equitable jurisdiction, together with a clear indication of the proper limitation of its exercise. . . .

"We can see no good reason for limiting the operation of this equitable doctrine to any particular class of contracts included within the statute of frauds, provided always the

essential elements of an estoppel are present, or for saying otherwise than as is intimated by Mr. Pomeroy in the words already quoted, viz., that is that it applies 'in every transaction where the statute is invoked.' It is a general equitable principle, a part of the broader equitable doctrine stated in *Dickerson* v. *Colgrove,* 100 U. S. 578, 580 [25 L. Ed. 618], and quoted therefrom in *Carpy* v. *Dowdell,* 115 Cal. 677, 687 [47 Pac. 695], as follows: 'The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both.' This broad rule with reference to equitable estoppel was recently reaffirmed in the case of *Notten* v. *Mensing, supra.* The latter case quoted with approval the rule stated in the case of *Anderson* v. *Hubble,* 93 Ind. 570, 576 [47 Am. Rep. 394], as follows: 'It is not necessary, in order to the existence of an equitable estoppel, that there should exist a design to deceive or defraud. The person against whom the estoppel is asserted must by his silence or his representation, have created a belief of the existence of a state of facts which would be unconscionable to deny, but it is not essential that he should have been guilty of positive fraud in his previous conduct. . . . All that is meant in the expression that an estoppel must possess an element of fraud is that the case must be one in which the circumstances and conduct would render it a fraud for the party to deny what he had previously induced or suffered another to believe and take action upon. . . . There need be no precedent corrupt motive or evil design.' "

We believe the instant case comes squarely within the rule thus announced in the Wilson case. The Hotel Company permitted its agents and officers to make representations to Mr. and Mrs. Grant and to perform the implied parol contract with them, and with Mrs. Grant for years. It permitted them to change their position by parting with the bonds which it still retains. It cannot deny the authority of its agents and refuse to be bound by the contract they made and still retain the benefits of such contract. (*E. Aigeltinger, Inc.,* v. *Burke,* 176 Cal. 621 [169 Pac. 373].) Its agents were silent when they should have spoken and now they and their prin-

742

cipal are estopped from denying their contract. (*Ayres* v. *Palmer*, 57 Cal. 309.)

■ Further, a contract partly performed is usually taken out of the operation of the statute of frauds. (*Haskell* v. *First Nat. Bank, supra.*)

■ Appellants urge that there can be no estoppel because they did not know that Mr. and Mrs. Grant were claiming free rent of the apartment and free service, meals and refreshments, until after March, 1935, it being necessary that the party estopped have knowledge of all the facts upon which the estoppel is based.

This argument is based on the testimony of various witnesses that the president (and his family) of a hotel corporation is always given the free accommodations that were furnished to Mr. and Mrs. Grant; that these accommodations were furnished in accordance with this custom and therefore amounted to nothing more than a revocable license and implied no notice of a claim of right to them by Mr. or Mrs. Grant.

This evidence merely conflicts with the evidence produced on behalf of Mrs. Grant which we have already set forth. Conflicts in the evidence are addressed to the trial judge and settled by him. It is the law that if either one of two inferences reasonably may be drawn from the same evidence it is the duty of an appellate court to draw the inference favorable to the party that prevailed in the trial court. (*Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421 [213 Pac. 42, 26 A. L. R. 123] ; *Witherow* v. *United American Ins. Co.*, 101 Cal. App. 334 [281 Pac. 668].) We must, therefore, conclude that the finding of the trial judge on the question of the right of the Grants to their free accommodations is properly supported and forecloses any argument here on the question of notice to the Hotel Company of claim of that right.

Appellants urge that the contract relied upon by Mrs. Grant is divisible, one part attempting to create an estate in real property, and the other part attempting to require the Hotel Company to furnish free service, food and refreshments. They further urge that if we assume the portion concerning the estate in real property can be supported, the other cannot.

This argument goes, first, to the sufficiency of the evidence to support that portion of the judgment giving Mrs. Grant the right to free service, food and refreshments. We have

already detailed this evidence and regard it as sufficient to support both phases of the contract. The same estoppel applies to the one as to the other.

Secondly, it is argued that as the part of the contract which relates to hotel service, food and refreshments, requires personal service, it cannot be specifically enforced.

The reply to this argument is that the decree does not order the Hotel Company or anyone else to furnish Mrs. Grant and her guests with hotel service, food and refreshments, not including intoxicating liquors. It merely declares her right to such service from the Hotel Company, free from interference on the part of the other defendants. This portion of the decree is merely declaratory and is neither mandatory nor prohibitory.

A contract that cannot be specifically enforced may form the basis for other legal rights. (*Pimentel* v. *Hall-Baker Co.*, 32 Cal. App. (2d) 697 [90 Pac. (2d) 588]; *Norris* v. *Lilly*, 147 Cal. 754 [82 Pac. 425, 109 Am. St. Rep. 188].)

Appellants urge that the finding that in 1914 Mrs. Grant purchased, from her husband, stock in the Hotel Company is not supported by the evidence. This argument is based upon the failure to issue any stock certificate to Mrs. Grant for a number of years after that date.

In 1914 a stock certificate was merely evidence of the ownership of stock in a corporation, and stock then might be sold or assigned without the manual tradition of a certificate. The failure of Mrs. Grant to have issued to her a certificate for stock in the Hotel Company is not conclusive evidence that she had not purchased and did not own the stock. (*Young* v. *New Pedrara Onyx Co.*, 48 Cal. App. 1 [192 Pac. 55].)

Appellants urge that the judgment in this case is too uncertain to be understood or enforced in that it cannot be determined therefrom just what service, food and refreshments must be furnished and whom or how many of Mrs. Grant's guests must be served. We repeat that the judgment here is merely declaratory of the rights of the parties and is neither mandatory nor prohibitory. It is drawn in accordance with the construction put upon the contract for more than twenty years during which time it was understood and performed without any disagreement or friction. If it was so understood and satisfactorily performed over that period of time there should be no serious obstacle to satis-

factory performance by giving the same quality of service, food and refreshments (exclusive of intoxicating liquors) in the future. The only cause of disagreement in the past was over furnishing an undue amount of liquors to Mrs. Grant after January 1, 1935. That cause of misunderstanding has been removed by the judgment which excludes intoxicants from the refreshments to be served.

Appellants urge that the trial judge erred in admitting certain conversations between Mr. and Mrs. Grant when no representative of the Hotel Company, other than Mr. Grant, was present. We think this evidence should have been excluded for reasons already given. However, from what we have already said it appears that we regard those errors as harmless.

The judgment is affirmed.

Barnard, P. J., concurred.

Griffin, J., being disqualified, did not participate herein.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 18, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 18, 1939.