[Civ. No. 14864.   First Dist., Div. Two.   May 12, 1952.]

HELEN K. BEATTY et al., Respondents, v. OAKLAND SHEET METAL SUPPLY COMPANY (a Corporation), Appellant.

Morris M. Grupp for Appellant.

Brown, Smith & Ferguson and Jacqueline Taber for Respondents.

JONES, J. pro tem.—This appeal is from a judgment awarding damages in the sum of $145,600 for loss of profits on account of an alleged breach of contract. The action has arisen out of a transaction in which plaintiffs, who are brokers in commodities, claim that they bought 20,800 tons of

sheet steel from the defendant, Oakland Sheet Metal Supply Company, on a contract, and had the steel resold at an advance, or overage, of $7.00 per ton when the defendant repudiated its contract. The trial court found for the plaintiffs and rendered judgment for the amount of the overage. It is from this judgment that the defendant has appealed.

Appellant has challenged the evidentiary value of the written instruments and most of the oral testimony upon which the findings of the trial court are based, and we deem it advisable for an ample statement of the facts to set out the writings and some verbatim excerpts from the testimony.

On February 20, 1948, after previous negotiations, Helen K. Beatty, one of the partners in the brokerage firm, presented to Isadore Schechtman, vice president of the defendant corporation, a purchase order in the following form:

"Cattle-Rice
  Grain-Fruit                              Licensed Broker
  General Merchandise                      TWinoaks 9833

BEATTY COMPANY
Importer-Exporter
3503 Lakeshore Ave.
OAKLAND 12, CALIF.

20 February 1948

Oakland Sheet Metal Supply Co.,
2100 Poplar Street,
Oakland, California

Gentlemen:

Att: Isadore Schechtman

"Please consider this as our purchase order No. 09302, covering the following merchandise:

"20,800 tons Cold Rolled SAE 1010 Deep Drawn Prime Steel Sheets, gauges and standard mill sizes—buyer's choice (sizes to be stipulated upon receipt of mill commitment.) Mill must ship minimum of 400 tons of steel per week for 52 consecutive weeks commencing June 1, 1948. Price of steel is $175.00 per net ton, FOB mill, Pennsylvania area. Mill commitment and delivery guarantee to be in our office this date, otherwise this Purchase Order is null and void. Subject to the terms and conditions as above stated, this may be considered a non-cancellable purchase order.

Yours very truly,
BEATTY COMPANY
Helen K. Beatty"

HKB/nbb

On the same date Schechtman handed Mrs. Beatty a writing in language as follows:

"OAKLAND SHEET METAL SUPPLY Co.          J. Leson

Oakland 7, California
February 20, 1948

21st & Poplar Streets,
P.O. Box 86
Telephone HIgate 2075-6-7

Beatty Company
3503 Lakeshore
Oakland, California

Attention: Mrs. Helen K. Beatty

Gentlemen:

"This is acknowledgment of your Purchase Order #09302 for 20,800 tons Cold Rolled SAE 10-10 Deep Drawn Prime Steel, gauges between 10 and 26, maximum width 48", maximum length 120", F.O.B. Tidewater, Pennsylvania, price $175.00 per net ton. Shipment of this steel will commence during the month of June for a twelve-month period, final shipment to be made approximately May 31, 1949. Our principals, the Atlantic Seaboard Steel Corporation, will deliver approximately 400 tons of steel per week for fifty-two consecutive weeks, subject to normal steel allowances of 15 per cent up or down. This commitment is subject to riots, strikes, Acts of God, war, government rules, laws and regulations, either federal, state or municipal, and any other conditions beyond the control of the mill. The purchaser has the option to accept or reject any steel undelivered because of the aforementioned causes.

"Your principals will establish a 90 day Letter of Credit, noncancellable, irrevocable and divisible with permission for us to pass on to the mill the right to purchase raw materials which, when so bought, will remain in your customers name and the full price of such materials will be deducted from the price of steel when delivered. The steel mill has agreed to guarantee such payments by depositing with Mr. Granville Carroll, Vice-President, National City Bank, 55 Wall Street, New York, New York, all of the capital stock of the company, with the exception of the number of qualifying shares necessary to be held by the officers and directors and a complete equity of the company in its real estate and building, as well as all its machinery and chattels whose value far exceeds any possible advance. The purchaser has the option to cancel any order if delivery does not commence

in June and will be repaid by the Atlantic Seaboard Steel Corporation advance in full, plus six (6%) per cent interest.

"We trust this meets with your approval.

Very truly yours,

Oakland Sheet Metal Supply Co., Inc.
Isadore Schechtman."

IS/ds

This document was handed to Mrs. Beatty in Schechtman's office, and the record discloses that she then said: "Q. Was there anything said then, by either you or Mr. Schechtman? A. Yes, I said it was entirely satisfactory. I had shown a similar one, as I mentioned, the day before, to my customer; and it was entirely satisfactory. Q. Was anything said by Mr. Schechtman? A. Nothing more at that time, that I can think of. Q. What did you do then? A. I left the office."

When she called on Schechtman Mrs. Beatty called to his attention the following purchase order from Salvatore Persico to her:

"Order No. 05776—Date Feb. 20th, 1948

M. Beatty Company

Address   3503 Lakeshore Avenue, Oakland, California

Ship to—Instructions to follow

At

How Ship                                    When

Terms Per Agreement

Salesman

Buyer Salvatore Persico Waterbury, New & Used Contractor's Equipment Co. 20,800 Tons of SAE 10-10 cold rolled Steel sheets deep drawn prime Steel—gauges and standard mill sizes buyers choice. Sizes to be stipulated upon receipt of mill commitment. Minimum shipment 400 tons per week for 52 consecutive weeks commencing June 1st, 1948 @ $182.00 per net ton f.o.b. mill Pittsburgh, Pennsylvania area. Mill commitment guaranteed to be in this office this date. This is subject to terms and conditions above stated and is to be considered non-cancellable.

Reference: Waterbury National Bank
                Waterbury, Connecticut
Louis F. Brandley (Mention Steel)
                                Salvatore Persico
Waterbury New & Used Contractor's Equipment Co.
                        47 Wilson Street
                        Waterbury, Connecticut."

Shortly after leaving Schechtman's office Mrs. Beatty wrote Persico as follows:

"BEATTY COMPANY
3503 Lakeshore
Oakland, California

February 20, 1948

Mr. Salvatore Persico
Waterbury New and Used Contractors Equipment
47 Wilson Street,
Waterbury, Conn.

Gentlemen:

"This is acknowledgment of your Purchase Order #09302 for 20,800 tons Cold Rolled SAE 10-10 Deep-Drawn Prime Steel, gauges between 10 and 26, maximum width 48", maximum length 120", F.O.B. Tidewater, Pennsylvania, price $182.00 per net ton. Shipment of this steel will commence during the month of June for a twelve month period, final shipment to be made approximately May 31, 1949. Our principals, the Atlantic Seaboard Steel Corporation, and the Oakland Sheet Metal Supply Co., 21st & Poplar Streets, P.O. Box 86, Oakland 7, California, will deliver approximately 400 tons of steel per week for fifty-two consecutive weeks, subject to normal steel allowances of 15% up or down. This commitment is subject to riots, strikes, Acts of God, war, government rules, laws and regulations, either federal, state or municipal, and any other conditions beyond the control of the mill. The purchaser has the option to accept or reject any steel undelivered because of the aforementioned causes.

"Your principals will establish a 90 day Letter of Credit, noncancellable, irrevocable and divisible with permission for us to pass on to the mill the right to purchase raw materials which, when so bought, will remain in your customers name and the full price of such materials will be deducted from the price of steel when delivered. The steel mill has agreed to guarantee such payments by depositing with Mr. Granville Carroll, Vice-President, National City Bank, 55 Wall Street, New York, New York, all of the capital stock of the company, with the exception of the number of qualifying shares necessary to be held by the officers and directors and a complete equity of the company in its real estate and buildings, as well as all its machinery and chattels whose value

far exceeds any possible advance. The purchaser has the option to cancel any order if delivery does not commence in June and will be repaid by the Atlantic Seaboard Steel Corporation advance in full, plus six (6%) per cent interest.

"We trust this meets with your approval.

Very truly yours,

BEATTY COMPANY

Helen K. Beatty"

HKB/ed

One of the contentions of appellant is that there is no evidence to show this offer of the steel by the Beatty Company to Persico was ever accepted by him. However, the defendant read into evidence the deposition of Benedetti, one of the partners of the Beatty Company, from which it appears: "Q. You and Mr. Persico waited at the hotel? A. Yes. Q. Mrs. Beatty came there? A. That's right. Q. At the Leamington Hotel, to a public stenographer, there was dictated the commitment to Persico, is that correct? A. That's right. Q. And then Mr. Persico signed it right then and there? A. He did not have to sign it. Q. I mean, you signed it or Mrs. Beatty signed it? A. Mrs. Beatty did. Q. And delivered it to Mr. Persico? A. That's right. Q. And he left, is that correct? A. He left that evening. . . . Q. Now, when did you next hear from Mr. Persico? A. When I received a wire from him, or a call from him, either the next day or the day after that, wanting to know if it was through, and everything was all right, and if this was actually the true commitment, or if it was a real firm offering. He wanted to know about the Oakland Sheet Metal, and if we had checked on it, and we told him we had checked on the Oakland Sheet Metal and found out they were a reliable firm on a firm offering of sheet steel. So then several days later, I received another wire, telling me it was sold. Q. You say 'another wire.' The first was a telephone conversation? A. Yes. Q. Then you received a wire? A. Yes. Q. And it told you what? A. That it had been sold. Q. That the steel had been sold? A. Yes. Q. And when was this? A. On or about the 28th. Q. Of what? A. February."

The following letter was sent to the Beatty Company by Schechtman on March 3, 1948:

"Oakland Sheet Metal Supply Co.        J: Leson
Oakland 7, California

21st & Poplar Streets,
P.O. Box 86
Telephones HI 2075-6-7

Beatty Company
3505 Lakeshore Ave.
Oakland, California.
Attention: Mr. Helen K. Beatty
Subject: Your Order No. 09031, 09302, 09303

Gentlemen:

"Pursuant to subject orders and our letters of February 19 and 20th, pertaining to same, please be advised effective immediately, we are withdrawing any tentative commitments we have made regarding same.

"We have not received any firm commitments from the Atlantic Seaboard Steel Company pertaining to the steel you desire to purchase. We have been offered the opportunity of purchasing cold rolled sheets originating from the Atlantic Seaboard Steel Company from other brokers. On tracing the originating commitments we find they have originated from the tentative commitments given to you.

"Due to the above we have no other alternative than to withdraw all tentative commitments made to you. Upon receipt of firm commitments from the Atlantic Seaboard Steel Company we shall resume negotiations with you for purchasing of steel.

"We trust this meets with your approval.

Yours very truly,
Oakland Sheet Metal Supply Co., Inc.

Is :cr.            Isadore Schechtman"

The Atlantic Seaboard Steel Corporation has no mill and was not producing steel at the time the above quoted correspondence was written. A group, including Schechtman of the Oakland Sheet Metal Supply Company, were promoting a rolling mill to be operated by the corporation. Steel ingots and bars were to be purchased in the market and rolled into sheets and plates. The promoters planned that the purchase would be financed by letters of credit to be established by purchasers of the rolled steel. The projected mill failed to materialize and the Atlantic Seaboard Corporation never produced any steel.

The grounds urged for reversal by appellant are identical to defenses made by its answer which were not abandoned. In addition to a denial of the allegations of the amended complaint the answer sets up several different special defenses. Of these special defenses the one which challenges the legal capacity of the plaintiffs to sue was abandoned at the trial. As to all other defenses, generally and specially made, the trial court found against the defendant upon substantial evidence.

These special defenses include the pleas that the action is barred by the statute of limitations, a point not urged on appeal; the nonexistence of a contract; that the defendant was acting as an agent for a disclosed principal; a variance between the purchase offer of the plaintiffs and the counteroffer of the defendant; failure of defendant to comply with the purchase order allegedly rejected by its own counteroffer; nonacceptance of its counteroffer; and lack and failure of consideration.

■ The answer also pleads that the amended complaint does not state facts sufficient to constitute a cause of action. As is stated in *Smith* v. *Tristam,* 130 Cal.App. 750, 754 [20 P.2d 770], ''This (is) was in effect a general demurrer,'' and goes to appellant's point that the demurrer was improperly overruled. ■ The amended complaint alleges the sale of the steel to the plaintiffs on contract; the resale by them of the steel at a higher price; the repudiation by the defendant of its contract; the impossibility of procuring other steel to supplant that contracted for; and the resulting damage. This, we think, states a good cause of action.

The contract does not, as hereinafter pointed out, state on its face that defendant was acting for a disclosed principal and not for itself in the transaction.

Appellant contends in the first place, as it has specially pleaded in its answer, that a contract for the sale of the steel never came into existence. It argues with much vigor that there was never an acceptance of its counteroffer by the plaintiffs. It is also contended that as to the resale there is no evidence to show that Persico accepted plaintiffs' counteroffer.

■ It is, of course, the rule that if a counterproposal is accepted by the original offeror, a binding contract is concluded. (6 Cal.Jur., p. 63.) ■ The acceptance, however, must be an unequivocal assent to the offer, although it is not essential that the identical language be repeated. As is

said in *Ennis-Brown Co.* v. *W. S. Hurst & Co.*, 1 Cal.App. 752, 761 [82 P. 1056]: "Any form of expression showing clearly an intention to accept on the terms proposed,—i.e., a consent to the same subject-matter in the same sense, would be sufficient if not coupled with some new condition . . ." And in *Grant* v. *Long*, 33 Cal.App.2d 725, 736 [92 P.2d 940], it is said that: "While an express contract is one, the terms of which are stated in words (*Treadwell* v. *Nickel*, 194 Cal. 243 [228 P. 25]), one party may use the words and the other may accept, either in words or by his actions or conduct. (*Lane* v. *Superior Court*, 104 Cal.App. 340 [285 P. 860])." In *Grimes* v. *Nicholson*, 71 Cal.App.2d 538, 541 [162 P.2d 934], the court said that, "Respondent's statement of the terms upon which he would perform the work, followed by appellant's answer, 'O.K.' and 'O.K. we will go to work,' constituted a valid and binding contract between the parties whereby appellant agreed to the conditions as stated by respondent."

█ Conduct of the offeree may, under proper circumstances, constitute acceptance. In *Fidelity & Cas. Co.* v. *Fresno Flume & Irr. Co.*, 161 Cal. 466, 473 [119 P. 646, 37 L.R.A.N.S. 322], the court said: "The receipt and acceptance by one party of a paper signed by the other, and purporting to embody all the terms of a contract between the two, binds the acceptor, as well as the signer, to the terms of the paper. (9 Cyc. 260, 391; Civil Code sec. 1589; *Watkins* v. *Rymill*, L.R., 10 Q.B.D., 178, 188)." Also in *Dallman Supply Co.* v. *Smith-Blair, Inc.*, 103 Cal.App.2d 129, 132 [228 P.2d 886], this court followed the rule so enunciated, setting out the language above quoted and citing in support thereof *Frankfort etc. Co.* v. *California A. M. & Wire Co.*, 28 Cal.App. 74, 82 [151 P. 176]; *Remsberg* v. *Hackney Manufacturing Co.*, 174 Cal. 799, 802 [164 P. 792]; *Barlow* v. *Frink*, 171 Cal. 165, 170 [152 P. 290]; *Fidelity & Cas. Co.* v. *Fresno Flume & Irr. Co.*, 161 Cal. 466, 473 [119 P. 646, 37 L.R.A.N.S. 322]; *Bloom* v. *Hazzard*, 104 Cal. 310 [37 P. 1037]; *California Jewelry Co.* v. *Provident Loan Assn.*, 6 Cal.App.2d 506, 510-511 [45 P.2d 271].)

█ When Schechtman handed to Mrs. Beatty the written terms of his offer to sell, she said to him that the offer "was entirely satisfactory." She took the writing with her, and based her written offer to Persico on the terms which it contained. Schechtman knew as is hereinafter more fully set forth that Mrs. Beatty intended to sell the steel to Persico. She told him that his offer was satisfactory, she took the writing with her, and she acted on it as she had told

him she was going to act. It is difficult to perceive how a clearer case of acceptance would be established.

The written offer by Mrs. Beatty to Persico was personally accepted by him, he verified it both by telephone and telegraph, and reported the steel sold, all before the letter of repudiation by the Oakland Sheet Metal Supply Company was written on March 3, 1948. As with the original offer, a clear case of acceptance of the Beatty counteroffer is made out.

It is argued by appellant that the sale was made not for itself but for a disclosed principal, the Atlantic Seaboard Steel Corporation, and that the Beatty Company was likewise acting for Persico, a disclosed principal, and that neither agent is bound. In this connection it is urged that Schechtman's letter of February 20th by its own terms establishes the agency of the Oakland Sheet Metal Supply Company. A situation similar in many respects was presented in the case of *Slama Tire Protector Co.* v. *Ritchie,* 31 Cal.App. 555 [161 P. 25]. It was there said: "The single question presented . . . is whether the contract . . . was one whereby the plaintiff agreed to sell and the defendants agreed to purchase . . . ; or to put the proposition in another form . . . whether the parties to the contract intended it to operate only to create between them the relation of principal and agent or that of creditor and debtor. . . ." It was held in that case that the contract was ambiguous in the respect stated, and the court said: "So, if there were no other evidence in this record but the instrument itself which throws or tends to throw any light on the relation which the parties by the contract intended to establish between themselves, . . . it would be our duty to uphold the construction given the contract by the trial court, as evidenced by its findings." The court there as in the case at bar had not only the writing itself before it, but there was much oral evidence of the facts and circumstances surrounding its execution permitted in evidence in aid of its interpretation. In this case the trial court permitted an exceptionally full and complete showing of the facts and circumstances leading up to and surrounding the execution of the writing. In *Nuland* v. *Pruyn,* 99 Cal.App.2d 603, 609 [222 P.2d 261], wherein the case of *Slama Tire Protector Co.* v. *Ritchie* is cited with approval, it is said: ". . . Whether a contract is in any of its terms ambiguous or uncertain is a matter of determination in the first instance by the trial court. If it is found to be, it is primarily the duty of such court to construe it, after a full opportunity

afforded the parties to produce evidence of the facts, circumstances and conditions surrounding its execution, and the conduct of the parties relative thereto. . . . And where a writing is so uncertain that either of the two constructions urged might be sustained, it is not within the functions of a court of review to declare that the interpretation given by the trial court should be supplanted by the other construction of which the instrument is susceptible. (6 Cal.Jur. 327, § 192.)'' See *Kautz* v. *Zurich Gen. A. & L. Ins. Co.*, 212 Cal. 576, 582 [300 P. 34], where it is said that if ''The construction given the instrument by the trial court appears to be consistent with the true intent of the parties . . . the appellate court will not substitute another interpretation *though it seem equally tenable.*'' (Italics added.) ■ Since the record discloses much substantial evidence to support the conclusion of the trial court that the parties were acting for themselves and not as agents for others, this court is without power to substitute any other findings or interpretation.

Appellant's additional contention that there is such a lack of consideration that there is no basis for a contract is equally without merit. Civil Code, section 1605, defines consideration as ''Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.''

Section 75 of the Restatement of Contracts states the ''Consideration for a promise'' to be ''a return promise, bargained for and given in exchange for the promise.'' ■ The court in this case in effect found that the seller promised to deliver 20,800 tons of steel to the buyer, and that the buyer promised to pay $175 per ton for it. These promises were the considerations moving each of the respective parties.

■ Much emphasis is laid on the fact that letters of credit had not been established up to March 3, 1948, the date of the repudiation. The trial court found that the time intervening, less than two weeks, was not a reasonable time in which to establish a credit for the price of the steel which totals $3,640,000. The record discloses that a credit sufficient to finance the purchase by Persico had been established in a New York bank and that a designation by the Oakland Sheet Metal Supply Company of the bank in which to establish the

letter of credit was being awaited by the purchasers. As heretofore stated appellant read into evidence the deposition of Nicholas Benedetti, from which deposition it appears, "Q. What did he (Persico) say about the money? A. That the money was in bank, waiting to be—I don't know whether it was waiting to be transferred or what, but he had received his funds from the group in New York." And "... I was informed that the money was up and ready to finance the buying of the steel." As stated, this evidence was offered by the appellant and it cannot now question its relevancy. In connection with the other evidence in the case it at least affords a basis for the inference that the contract of sale was revoked before respondents had a reasonable time to establish the required letter of credit.

Appellant argues that even though an effective contract did result from its negotiations with respondents, nevertheless its offer was of steel from a specific source, and this source never materialized and it became excused from performance. It is contended that there was an implied condition precedent in the offer, known and understood by all parties to the transaction that the offered steel was to be manufactured by the Atlantic Seaboard Steel Corporation, and that since no mill was set up and no steel rolled, appellant was not bound to make delivery from any other source. The trial court found "that said contract was not conditioned upon the coming into existence of any steel mill nor upon any other condition not expressly set forth in the written offer." The question which appellant presents is again one of fact, and, if there is any substantial evidence to support the recited finding this court under a legion of authorities is without power to set it aside.

In the counteroffer of appellant the particular steel to be delivered is not specified. There is a statement that the delivery will be by the Atlantic Seaboard Corporation, but not that it is to be produced by them. The language of the counteroffer is: "Our principals, the Atlantic Seaboard Steel Corporation *will deliver* approximately 400 tons of steel per week for fifty-two consecutive weeks, subject to normal steel allowances of 15% up or down." (Italics added.) This is the only language contained in the counteroffer with respect to delivery and it is barren as to the source of the steel. The only person bound to effect the delivery is appellant whose signature is affixed to the writing.

The record discloses that the oral testimony is in sharp conflict on the issue of implied conditions. Mrs. Beatty testified that she had no knowledge of any mill to be built by the Atlantic Seaboard Corporation, and that she was dealing with the Oakland Sheet Metal Supply Company expecting it to procure the steel from whatever source it might select. In her testimony she flatly denies the statements of Schechtman that he had explained to her that the steel sold was to be produced by the Atlantic Seaboard Steel Corporation. On the other hand his testimony on this material issue that such statements and explanations were so made is positive. The trial court was confronted with the problem of believing or disbelieving one or the other of the witnesses. It is not the function of the reviewing court to reconcile such a conflict.

There is no provision in the counteroffer against nonproduction by the Atlantic Seaboard Steel Corporation.      As is said in *S. L. Jones & Co.* v. *Bond,* 191 Cal. 551, 555 [217 P. 725], "If a party desires to be free from his obligation to deliver a commodity in the event of nonproduction by a particular concern, it is incumbent upon him to make a clear provision to that effect in his contract. (*Law* v. *San Francisco Gas etc. Co.,* 168 Cal. 112 [142 P. 52, Ann.Cas. 1915D, 842].)" From the failure of appellant to incorporate such a provision in the written offer of its own preparation the trial court may well have inferred that none was intended. Such an inference is, of course, sufficient to sustain the finding that the parties did not intend that the steel was to be produced by any particular concern.

The right of respondents to damages for loss of profits is also challenged by appellant. This challenge is made on the ground that no knowledge was had by appellant of the resale to Persico. Authorities are cited in support of the rule that special damages based on a resale of the subject matter of the sale, such as loss of profits which would have accrued to a buyer had he been able to carry out the resale contract, cannot be recovered by him for a breach of the sale contract by the seller, where the latter was not informed of the resale and was not chargeable with notice thereof. The facts in this case decisively establish that the defendant did have knowledge of the resale and was cognizant of the price at which the steel was being resold. The verbatim testimony of Mrs. Beatty is: "Q. I show you here, Mrs. Beatty, a paper dated February 20, 1948, showing an order No. 05776, signed by Salvatore Persico at the bottom, and ask you if you recog-

nize that? A. Yes, that is an order from my customer. Q. Did you present that to Mr. Schechtman? A. I presented that to Mr. Schechtman together with a purchase order of my own, which I handed to him. Q. You did present this to Mr. Schechtman? A. I presented both of them to him at the time. Q. On what day? A. The 20th of February, 1948. Q. How did you present this to Mr. Schechtman? A. In person. Q. You handed it to him? A. Yes. Q. Where? A. In his office. Q. On the 20th of February, 1948? A. On the 20th of February, 1948, yes."

The testimony of Schechtman is: "Q. Did you read the orders from Mr. Persico? A. Yes. Q. And you knew she was selling this steel to Mr. Persico? A. That is right. Q. And the order said that her sale to him was at the rate of $182.00 per ton? A. That is right. Q. And you learned that any time prior to the 20th of February? A. No sir. Q. But you did know it on the 20th of February when you read this letter? A. That is right, when I read the purchase order that was made to her, Persico's purchase order. Q. That is right, Persico's purchase order to her and that was handed to you at that time? A. She showed it to me and—— Q. You did read it? A. Yes sir."

The undisputed facts of the case rule out the doctrine relied on by appellant, and the authorities cited are not in point.

That it is not unusual for brokers to buy on their own account and to sell at an advance in lieu of a commission is demonstrated by the case of *Laurence* v. *Pacific Oil etc. Works,* 27 Cal.App. 69 [148 P. 964]. The markup is termed overage. In that case the broker bought oil on his own account from a vendee under an original contract of sale and sold it to his own customers at an advanced price. The vendor under the original contract delivered the oil to the broker's customers at his direction and collected at the broker's price. It then refused to pay him his overage. The trial court gave judgment for the overage, which judgment was sustained.

The case of *Morello* v. *Growers Grape Prod. Assn.,* 82 Cal. App.2d 365, 375 [186 P.2d 463], quoting from *Tahoe Ice Co.* v. *Union Ice Co.,* 109 Cal. 242, 249 [41 P. 1020], states that, "Loss of profits which, like those claimed in the case at bar, are the direct and natural results of a contract, and which the law implies from such breach *are recoverable without special allegations.*" (Italics added.) To the same effect is *Patty* v. *Berryman,* 95 Cal.App.2d 159 [212 P.2d 937].

Every ground urged by appellant for reversal presents a

question of fact, upon which the trial court has made a finding based on substantial evidence. This evidence is in some particulars conflicting, but this court may not disturb the findings upon the ground of conflict alone. (*Taylor* v. *J. B. Hill Co.*, 31 Cal.2d 373, 378 [189 P.2d 258].) In *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183], our Supreme Court has made the statement, which many courts have adopted, that, "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court," citing *Treadwell* v. *Nickel*, 194 Cal. 243 [228 P. 25]; *Bancroft-Whitney Co.* v. *McHugh*, 166 Cal. 140 [134 P. 1157]; *Wing* v. *Kishi*, 92 Cal.App. 495 [268 P. 483]. The same rule applies of course when the court sitting without a jury is the trier of the facts. And in *Richter* v. *Walker*, 36 Cal.2d 634, 640 [226 P.2d 593], the court said: ". . . as to the sufficiency of evidence to support findings, it is the time honored rule that all substantial conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the findings if possible." To the same effect are *Powell* v. *Pacific Elec. Ry. Co.*, 35 Cal.2d 40, 42 [216 P.2d 448]; *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689] and *Moran* v. *Board of Medical Examiners*, 32 Cal. 2d 301, 309 [196 P.2d 20]. In order to secure the reversal of a judgment on the grounds that the findings are not sustained by the evidence an appellant must show that there is no substantial conflict in the evidence upon which the findings are based, and that the facts as found as well as all reasonable inferences deducible therefrom are contrary to the proven facts. In the present case this has not been done.

The judgment is affirmed.

Nourse, P. J., and Goodell, J., concurred.

The opinion was modified and a petition for a rehearing was denied June 11, 1952.

Appellant's petition for a hearing by the Supreme Court was denied July 10, 1952. Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.