**R. W. FINE, Plaintiff,**

v.

**TRAVELERS INDEMNITY COMPANY, Defendant.**

**C. E. RUSSELL, d/b/a General Tire Service, Plaintiff,**

v.

**TRAVELERS INDEMNITY COMPANY and S. S. Silberblatt, Inc., Defendants.**

**MISSOURI–ILLINOIS TRACTOR & EQUIPMENT COMPANY, Plaintiff,**

v.

**TRAVELERS INDEMNITY COMPANY and S. S. Silberblatt, Inc., Defendants.**

**SINCLAIR REFINING COMPANY, Plaintiff,**

v.

**S. S. SILBERBLATT, INC., and Travelers Indemnity Company, Defendants.**

**FABICK & COMPANY, Plaintiff,**

v.

**W. S. CONNER, S. S. Silberblatt, Inc., Sterling Brukar Company, Inc., and Travelers Indemnity Company, Defendants.**

**P & P LUMBER COMPANY, Inc., Plaintiff,**

v.

**TRAVELERS INDEMNITY COMPANY and S. S. Silberblatt, Inc., Defendants.**

Nos. 1852, 1877, 1901, 1937, 1945, 1954.

United States District Court
W. D. Missouri, S. D.

Sept. 8, 1964.

White & White, Rolla, Mo., Neale, Newman, Bradshaw, Freeman & Neale, Springfield, Mo., for United States for use and benefit of R. W. Fine.

Cohn & Lentz, Waynesville, Mo., for C. E. Russell, Sinclair Refining Co. and others.

Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., Lincoln, Haseltine, Keet, Forehand & Springer, Springfield, Mo., for United States for use and benefit of Missouri-Illinois Tractor & Equipment Co., Inc.

Ernest A. Brooks, II, St. Louis, Mo., Lilley & Cowen, Springfield, Mo., for Fabick & Co.

Miller, Fairman, Sanford, Carr & Lowther, Springfield, Mo., for P & P Lumber Co.

Farrington & Curtis, Springfield, Mo., Francis L. Kenney, Jr., St. Louis, Mo., Owens & Purser, Austin, Tex., for William S. Conner and others.

Farrington & Curtis, Springfield, Mo., Kenney & Reinert, Francis L. Kenney, Jr., St. Louis, Mo., for Travelers Indemnity Co. and S. S. Silberblatt, Inc.

JOHN W. OLIVER, District Judge.

This memorandum opinion will determine another issue involved in six of the cases included in the multiple consolidation of Capehart cases pending on the docket of the Southern Division of this Court. See United States v. Travelers Indemnity Company, W.D.Mo.1963, 215 F.Supp. 455. See also Triangle Electric Supply Co. v. Mojave Electric Co., W.D. Mo.1963, 217 F.Supp. 913, affirmed sub nom., D & L Construction Co. v. Triangle Electric Supply Co., 8th Cir. 1964, 332 F.2d 1009, and Travis Equipment Co. v. D & L Construction Co., W.D.Mo.1963, 224 F.Supp. 410.

In Travelers Indemnity we determined, and in Triangle Electric we applied, the legal principle that "the rules of decision that will be applied to the [various] factual situations involved in the various cases will be the rules of decision developed under the Heard and Miller Act decisions."

Our Court of Appeals, in affirming Triangle Electric, held that, upon the record before it in that case, we had properly determined and applied the applicable Heard and Miller Act rules of decision to the factual situation there presented.

The Court of Appeals also emphasized in Triangle Electric that it had recognized in Continental Cas. Co. v. United States, for Use and Benefit of Robertson Lumber Co., 8th Cir. 1962, 305 F.2d 794, cert. denied 371 U.S. 922, 83 S.Ct.

290, 9 L.Ed.2d 231, that a "Capehart bond is a bond required by federal law" and that it had stated in that case "that Congress intended that Capehart should have substantive bond protection essentially similar to that of Miller Act suppliers" (l. c. 1011 of 332 F.2d).[1]

The Court of Appeals in Triangle Electric also noted that it had held in Robertson Lumber that "42 U.S.C.A. § 1594a gave the Secretary of Defense the right to prescribe the form of bond to be furnished on Capehart Projects", and that "the procedural provisions of the Capehart bond must be followed" (l. c. 1011 of 332 F.2d). But the Court of Appeals made clear that in so holding, it had "said nothing about the Miller Act decisions lacking persuasiveness in instances where the Miller Act bond and Capehart bond contained substantially similar provisions" (l. c. 1011 of 322 F.2d).[2]

As we did in Triangle Electric (l. c. 914 of 217 F.Supp.), we expressly adopt all applicable language of what we said in Travelers Indemnity and, of course, we shall follow the rationale of the Court

---

1. This opinion was prepared in final draft before we had the benefit of Judge Blackmun's excellent opinion in Continental Casualty Company v. Allsop Lumber Company, Inc., 8th Cir. 1964, 336 F.2d 445, decided August 26, 1964.

That case was originally Case No. 1806, on the docket of our Southern Division, and was tried by Judge Duncan before we were assigned to that division and before we consolidated all pending Capehart cases for pre-trial purposes. Allsop Lumber affirmed Judge Duncan's unreported memorandum opinion. It also, however, dealt directly with the problems of rationale with which we struggled in Travelers Indemnity and gives the Bar and the district courts of this circuit clear guidance in regard to the rationale our Court of Appeals now wants applied to Capehart litigation in general, and how Robertson Lumber is to be read in particular.

We take footnote notice of Allsop Lumber at this point because Judge Blackmun, in much the same language that we used above, made definitive reference to the Court of Appeals' "comments in Robertson, which were noted again in D & L Constr. Co. v. Triangle Elec. Supply Co., supra, that Capehart suphart suppliers should have similar substantive bond protection [to that of Miller Act suppliers]" (page 456).

We shall make additional footnote references to Allsop Lumber, and add that, except for the necessity of getting our opinion in the hands of counsel prior to the already set final pre-trial conference in these and still other Capehart cases, we would have rewritten this memorandum in order to give more appropriate treatment to that opinion.

2. Judge Blackmun's amplification in Allsop Lumber of what we quoted above from Triangle Electric is consistent with our reading of the latter opinion's construction of Robertson Lumber. Judge Blackmun held: "We therefore do not regard the Robertson opinion as taking Capehart bonds 'out of the Miller Act' in every respect and particularly so far as jurisdictional matters are concerned. The sentence [in Robertson] which Judge Oliver found so troublesome [i. e., 'we think that the clear import of the language used was to take Capehart bonds entirely out of the Miller Act'] must be read, as he intimated, in context and not out of it, and in the light of the issue and holding of that case. We sympathetically agree in general with Judge Oliver's analysis of Robertson when he observed, pp. 461–463 of 215 F.Supp., that we 'did not hold that the Miller Act did not apply to a government military housing project contracted for under the authority of the Capehart Act'; that we reasoned that 'the Miller Act does apply, at least in some respects'; * * * that the Miller Act is generally applicable to all government contracts of this type; that * * * the Robertson case 'can not be said to be a definite holding that the Miller Act does not in any way apply to the contracts for the construction of military housing as authorized by the Capehart Act'; * * * and that this court did not intend its exclusionary language 'as a blanket command'. See, as to all this, D & L Constr. Co. v. Triangle Elec. Supply Co., supra, 332 F.2d 1009. * * * Robertson stands for what it holds, namely, that the notice provisions of a Capehart bond prevail over the less stringent notice provisions in the Miller Act. We adhere to Robertson in this respect." (l. c. pages 451, 452).

of Appeals' decision in Triangle Electric, and we add by interlineation, Allsop Lumber.

In Travelers Indemnity we indicated that in all the consolidated cases "the principles of MacEvoy Co. v. United States, for Use and Benefit of Calvin Tomkins Co., 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944), will be followed" and that "[i]n determining the status of a particular plaintiff we shall accept the definitions announced in MacEvoy and attempt to apply them realistically to facts of each pending case" (l. c. 474–475 of 215 F.Supp.).

In approaching the question involved in the particular cases now before us, it must be noted at the outset that such question does not involve a procedural provision of a Capehart bond, within the meaning of the distinction between "procedural" and "substantive" provisions established by our Court of Appeals in Robertson Lumber.[3] We are here concerned with the substantive rights of the parties. None of the parties contend to the contrary.

The parties have stipulated that the provision of the Capehart bonds in dispute is as follows:

"A claimant is defined as one having a direct contract with the principal or with a sub-contractor of the principal who has furnished labor, material, or both, in the prosecution of the work provided for in the contract and who has not been paid in full therefor. Labor and material are construed to include, but are not limited to, that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the contract."

In broad factual outline, plaintiffs involved in these cases supplied labor or materials to one W. S. Conner who, according to defendants' position, was a subcontractor of Sterling Brukar, Inc., who was, according to defendants' position, a subcontractor of S. S. Silberblatt, Inc., the prime contractor on one of the Fort Leonard Wood Capehart housing projects.

Defendants contend generally that plaintiffs' contractual relationships were too remote from the prime contractor to permit recovery by them on the required bonds. Plaintiffs contend otherwise.

Recognition must be given at the outset to the legal principle that the substantive rights of the plaintiffs are not defined solely by the clause quoted from the Capehart bond. Consideration must, for reasons to be presently detailed, be given to the substantive rights established by the Miller Act. The definition of a "claimant" as contained in the Capehart bond is but an obvious paraphrase of the provisions of the Miller Act we now notice.[4]

Section 1(a) (2) of the Miller Act (Section 270a(a) (2) of Title 40, United States Code) broadly provides that a bond be furnished for all government construction projects "for the protection of all persons supplying labor and material in the prosecution of the work provided for in [the] contract."

Section 2(a) of the Miller Act (Section 270b(a) of Title 40, United States Code), also broadly provides that "[e]very person who has furnished labor or material in the prosecution of the work provided for in such contract * * * who has not been paid in full * * * shall have the right to sue on such pay-

---

3. On page 452 of Judge Blackmun's opinion he stated that the Court of Appeals did not want "to introduce further complications into an already too complicated area by the development of technical niceties of distinction between procedural and jurisdictional and substantive aspects".
We have not eliminated all of our discussion of what is substantive and what is procedural because we must still give

Robertson Lumber recognition to the extent stated in Triangle Electric and Allsop Lumber.

4. On page 453 of the opinion in Allsop Lumber, Judge Blackmun held that: "It is at once apparent * * * that the Capehart bond language closely follows and was evidently taken from that portion of the Miller Act which is now 40 U.S.C. § 270b(a)."

ment bond * * * and to prosecute said action to final execution and judgment for the sum or sums justly due him."

A proviso to the last quoted section then states:

"*Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, * * *."

MacEvoy held that while "[t]he Miller Act, like the Heard Act, is highly remedial" and was therefore "entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects," that nevertheless, "such a salutary policy does not justify ignoring plain words of limitation and imposing wholesale liability on payment bonds."

Specifically, MacEvoy held that the proviso of Section 2(a) of the Miller Act contained "limitations on liability which Congress intended to impose and did impose" and that:

"The proviso of Section 2(a), which had no counterpart in the Heard Act, makes clear that the right to bring suit on a payment bond is limited to (1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-contractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contractor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act."

The particular issue for determination under the clause of the Capehart bond quoted above and under the proviso of Section 2(a) of the Miller Act and the gloss added by MacEvoy was stipulated by the parties as follows:

"The issue to be determined pursuant to this stipulation is whether persons who supplied materials and labor, or both, to W. S. Conner at Fort Leonard Wood, Missouri, in connection with the contract of S. S. Silberblatt, Inc., with the United States of America, acting by and through the Department of the Army and certain Delaware corporations, for the construction of 800 units of military housing at Fort Leonard Wood, Missouri, are claimants within the terms of the six separate payment and performance bonds furnished by defendant Travelers Indemnity Company, copies of said contract and bonds being attached hereto as described in Schedule B. More specifically, the issue to be determined by the Court under this stipulation is the relationship between S. S. Silberblatt, Inc., and Sterling Brukar, Inc., and the further determination of whether that relationship is such that those plaintiffs who have supplied materials and labor or both to W. S. Conner were supplying such materials and labor to a sub-contractor, as defined in said bonds, or were supplying such materials and labor to a sub-contractor of a sub-contractor."

The parties also stipulated:

"Each of the parties to this stipulation hereby waive a jury with respect to the above issue and agrees that it shall be determined by the Court, pursuant to Rule 42(b) Federal Rules of Civil Procedure. It is

further agreed that the Court may consider that each party hereby moves for partial summary judgment on said separate issue; the Court, in ruling on such motions and in determining said issue may consider the following evidence: [designating various depositions, documents, exhibits and offers of proof attached to the stipulation]

\*　\*　\*　\*　\*　\*

"It is further stipulated and agreed by the parties to this stipulation that, for the purposes of determining this issue, no party desires to offer any evidence other than or in addition to that above mentioned."

There is, of course, some difference in the language used in the quoted clause of the Capehart bond and the language used by the Supreme Court in MacEvoy to describe the limitations of liability intended by the Congress on the bonds it required on government projects. The language of the Capehart bond, on superficial reading, might be read as an attempt to require that a claimant must have a "direct contract" with the prime contractor or with a subcontractor of the prime contractor before he could have a right to sue on the bond.

The proviso of Section 2(a) of the Miller Act, however, requires that only a "direct contractual relationship" exist between a plaintiff and a subcontractor and that is only required in the event such plaintiff does not have a "contractual relationship express or implied" with the prime contractor.

MacEvoy's paraphrase of the proviso of Section 2(a) carefully states that Congress had made clear that (1) materialmen, laborers and subcontractors "who deal directly" with the prime contractor and (2) materialmen, laborers and sub-subcontractors who, "lacking express or implied contractual relationship with the prime contractor," but who nevertheless "have direct contractual relationships" with a subcontractor of the prime contractor shall have the substantive right to bring suit on the Congressionally required bond.

It is not tenable to argue that the definition in the clause of the Capehart bond that "a direct contract" must be found to exist with either the prime contractor or with one of his subcontractors before one can be said to be a "claimant" is a more strict limitation of liability than that established by the Miller Act. Such an argument is untenable for several independent reasons.

■ First, as we held in Travelers Indemnity, "the provisions of the Miller Act must be read into any and all payment and performance bonds" required by the federal law here involved. (l. c. 473 of 215 F.Supp.).[5] Our Court of Appeals has twice held, first in Robertson Lumber and most recently in Triangle Electric, that, as stated in the latter case, "the Capehart bond is a bond required by federal law and \* \* \* Congress intended that Capehart should have substantive bond protection essentially similar to that of Miller Act suppliers" (l. c. 1011 of 332 F.2d).

In both cases, the Court of Appeals held that "Capehart housing is undoubtedly 'Government housing'" (as stated in Robertson Lumber, l. c. 797 of 305 F.2d), and that "Miller Act bonds and

---

5. On page 451 of the Allsop Lumber opinion, Judge Blackmun noted that we had stated in Travelers Indemnity that we believed "that all substantive provisions of the Miller Act and the Capehart Act were to be read into Capehart bonds." We recognize that express general agreement was not specifically noted in regard to that portion of our opinion; but we believe that the Court of Appeals' suggestion that the quoted portion of Travelers Indemnity carried with it the force of "appealing logic" and its suggestion that our "analysis and struggle with \* \* \* the implications of Robertson \* \* \* have not been in vain" are not to be read as a rejection of one of the principal foundations upon which rests our basic approach to the problems presented by the Capehart cases that pend before us. We therefore let stand our reiteration of what we first held in Travelers Indemnity.

Capehart bonds * * * are designed to serve substantially the same purpose, that is, to protect parties furnishing labor and materials used on federally sponsored projects" (as stated in Triangle Electric, l. c. 1012 of 332 F.2d).[6]

■ If the language of the Miller Act is not read into a Capehart bond, or if the "direct contract" definition of a "claimant" as contained in a Capehart bond is read in a manner that would create a greater limitation on the liability created by the Congress by the Miller Act, then it would be obvious that one who sues to recover for labor and material furnished on a Capehart bonded government job would not have the same substantive right to sue and recover as would persons asserting their substantive rights under the protection afforded them by the Miller Act. It necessarily follows that substantive, rather than procedural, rights are involved in this case and that the limitations of liability on the Capehart bond can not be construed in a manner different from those imposed by the Miller Act.[7]

Secondly, we are very doubtful whether the definition of a claimant in a Capehart bond as one having a "direct contract" with the prime contractor or with a subcontractor of the prime contractor is, so far as the facts of these cases are concerned, of particular significance because (a) undoubtedly we must, under the cases, give that language a broad construction, and (b) a broad construction of that language requires that we construe the "direct contract" language of the Capehart bond broadly enough to include either an express or implied contract, made either orally or in writing.

Certainly we are not to construe the language "direct contract" as meaning that a formal written contract is required, or that the rights of claimants on the bond are to be controlled by the presence or by the absence of formal written documents which may, or may not, under the particular facts of individual cases, accurately or inaccurately reflect the true contractual relationship that in fact existed between the parties.

■ And thirdly, we are of the opinion that the facts that we find in these particular cases make academic any possible conflict between the limitation of liability language used in the Capehart bond and the limitation of liability language used in the Miller Act. In other words, under the facts as we find them, we are convinced that the plaintiffs have a right of action on the bond under either the definition of a "claimant" as contained in the Capehart bond, or under the definition of liability set forth in the proviso of Section 2(a) of the Miller Act and the gloss of MacEvoy.

6. On page 449 of the Allsop Lumber opinion, Judge Blackmun noted that "the Capehart Act is concerned with a government need" and that the very language of that Act "demonstrates the reality and the integrity of the government's interest." On page 449, he directed attention to the same portions of Robertson Lumber and Triangle Electric that we above quoted in the preceding paragraphs of our present opinion. While Judge Blackmun's discussion was directed to the Section 1352 jurisdictional point, his revelation as to the inclination of the Court of Appeals' present view of alternative jurisdiction of the subject matter under the Miller Act (as stated on page 450), and its express holding in regard to how jurisdiction of the person may be acquired in Capehart cases, suggests that our reliance on those cases for the purposes we state above is not misplaced. (In regard to Allsop Lumber's holding in regard to jurisdiction of the person, see page 452 of the opinion where Judge Blackmun held that "[i]f strict logic perforce demands a conclusion that this decision is but another way of saying that § 270b(b) of the Miller Act has application to a Capehart bond suit, we may be understood as going that far in our present holding.[3]" In supporting footnote 3 to that holding, Judge Blackmun approves the result we reached on the same question in Travis Equipment, directing particular attention to what we said on that subject on pages 417–418 of 224 F.Supp.

7. See footnote 3 as to the reason we let this paragraph stand as written.

Judge Learned Hand, in Commissioner of Internal Revenue v. Sansome, 2nd Cir. 1932, 60 F.2d 931, noted that applying labels such as "form" and "substance", and we might add, labels such as "piercing corporate entities", or calling one corporation the "alter ego" of another, sometimes confuses rather than clarifies the expression of an applicable legal principle. Judge Hand held that in dealing with the not dissimilar question of whether particular corporate manipulations can be said to have broken the continuity of corporate life, courts have "beclouded" that troublesome question "by recourse to such vague alternatives as 'form' and 'substance,' anodynes for the pains of reasoning" (l. c. 933 of 60 F.2d).

The basic rationale of MacEvoy eases what Judge Hand called the "pains of reasoning" so far as the issue here involved is concerned. MacEvoy teaches that courts are "to utilize ordinary judicial tools of definition" in order to understand what the Miller Act meant when it made reference to a "subcontractor". That case made clear that the Congress used the word "subcontractor," as that word that had acquired, "by usage in the building trades," a specific and "more technical meaning" than the broad, generic meaning that could generally be ascribed to it (l. c. 108 of 322 U.S., at page 894 of 64 S.Ct.).

MacEvoy held that a "subcontractor * * * [within the] meaning Congress attached to the word in the Miller Act * * * is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract." It would follow that one who does not, in a very real sense, "perform for" and who does not, in a very real sense, "take from" the prime contractor a specific part of the contract is one who is something other than a "subcontractor", within the meaning of the Miller Act.

Before discussing the facts as they establish whether Sterling Brukar Company, Inc. did in fact take from S. S. Silberblatt, Inc., and perform for it a specific part of the contract, and the facts concerning the W. S. Conner's actual relationship to both those corporations, we shall discuss several recent cases that illuminate the questions presented.

United States for Use and Benefit of Newport News Shipbuilding and Dry Dock Co. v. Blount Brothers Construction Co., D.C.Md.1958, 168 F.Supp. 407, a Miller Act case, applied MacEvoy to a factual situation in which it was perfectly apparent on the facts there involved that plaintiff was in too remote a relationship from the prime contractor and therefore was not entitled to recover on the Miller Act bond.

United States to Use of Acme Furnace Fitting Co. v. Ft. George G. Meade, etc., D.C.Md.1960, 186 F.Supp. 639, involved the Ft. Meade Capehart housing project. One Miller was awarded the prime contract. Miller purported to subcontract the entire contract to McCloskey. McCloskey subbed the heating installation to Sunbeam. Acme, the plaintiff, at Sunbeam's request, furnished materials and was not paid. Acme, of course, brought an action on the bond which named Miller, but not McCloskey, as principal.

Acme's action was defended on the same general theory that the cases before us are defended—namely, that the terms of the Capehart bond defined a claimant as "one who has a contract with the alleged principal, Miller, or with a subcontractor of said alleged principal, and that Acme had no such contract with Miller or a subcontractor of Miller" (l. c. 643 of 186 F.Supp.). Acme's action was also defended on the theory that even if the Miller Act could be said to be applicable, Acme could not recover because it was within an area of remoteness as defined by the limitations on liability contained in the proviso to Section 2(a) of the Miller Act.

While Judge Watkins' rationale in regard to some points that relate to the Capehart Act is not consistent with what either we or our Court of Appeals have held in regard to those points, we believe

that his approach to the issue involved in the cases now before us is a correct one. Judge Watkins made clear that:

"If, on the merits, Acme can sustain its allegation of complete assignment or of joint venture so as to prove that Sunbeam's contract with McCloskey was, in fact, one made by McCloskey as a prime contractor or as a part of a joint venture with Miller and as an agent of Miller, thereby making Miller a party to Sunbeam's contract, the paper relationship of the parties would be telescoped. Sunbeam would accordingly become a subcontractor and Acme as a materialman supplying Sunbeam would be within the purview of the Miller Act, not standing in too remote a relationship under Chief Judge Thomsen's holding in United States for Use and Benefit of Newport News Shipbuilding & Dry Dock Co. v. Blount Brothers Const. Co., D.C.Md.1958, 168 F.Supp. 407." (l. c. 651 of 186 F.Supp.)

The Ft. George G. Meade case emphasizes that "the basis of the Miller Act protection or protection under the [Capehart] bond in question is not primarily to be grounded on what the parties may be called or named, whether by themselves or others" (l. c. 652 of 186 F. Supp.). The basis of adjudication requires, the cited case continued, "a qualitative determination of the substantive, and functional role of performance of the parties under the circumstances" (l. c. 652 of 186 F.Supp.).

Judge Watkins relied upon MacEvoy to hold that "substance controls". Judge Watkins did not use the "form" and "substance" language of some of the cases as an "anodyne for the pains of reasoning," to again borrow Judge Learned Hand's language from Sansome. Those words were used as shorthand language to explain the factual problem that is presented on the merits in cases such as the one before him and those now before us. Judge Watkins said on page 652 of 186 F.Supp.:

"On the issue of whether or not the use-plaintiff stands in too remote a relationship to the prime contractor, the problem before the court is, does substance or form control in determining who is the prime contractor; that is, whether entitlement to relief is governed by the actual role and function of performance of a party, or is otherwise based on some formal criteria, as the term or the label by which a party may be designated in a contract."

After holding that "[s]ubstance, not form, was the crux and heart of the decision in the MacEvoy case," and after holding that "emphasis was placed squarely on substance, not form" in Blount, Judge Watkins overruled defendants' motion to dismiss in order that discovery procedures "disclose the true relationship between the parties—specifically whether or not because of the original dealings between the Department, Miller and McCloskey and/or Miller and McCloskey, the use-plaintiff does or does not stand in too remote a relationship to recover on the payment bond" (l. c. 652–653 of 186 F.Supp.).

Continental Casualty Company v. United States for Use and Benefit of Conroe Creosoting Co., 5th Cir., 1962, 308 F.2d 846, illustrates the speed with which federal courts, under particular factual situations, have telescoped paper relationships that seem to have not infrequently occurred on Capehart government projects.

In that case Hal Hayes Texas, Inc., was awarded the prime contract. Under what was defended as a valid "subcontract," part of the work was supposedly let to a subsidiary of the prime contractor known as Winn Contractors, Inc. Mojave Electric, so far as the paper work revealed, subcontracted with the plaintiff Conroe Creosoting Company for some creosoted utility poles. Mojave failed to pay; Conroe sued on the bond; and the familiar defense in these cases—namely, that the plaintiff was a sub-subcontractor to a sub-contractor and that therefore

plaintiff was, "under the terms of the bond too far removed from the original contractor to enjoy any privileges or protection under the bond" (l. c. 848 of 308 F.2d) was interposed.

The district court submitted and the jury determined in favor of the plaintiff "the question as to whether the use by Hal Hayes Texas, Inc., of Winn Contractors, Inc., was a sham or device or subterfuge and mere tool of Hal Hayes Texas, Inc., as applied to the Capehart Housing Project contract" (l. c. 848 of 308 F.2d).

The bonding company defendant in Continental Casualty contended that corporate structures could not be pierced under the applicable Texas law and that the district court had erroneously submitted the issue above stated to the jury. In affirming the district court and the judgment for the plaintiff, the Fifth Circuit held:

"So far as the record in this case is concerned, we have nothing more than a shadow of Winn Contractors, Inc., and the verdict of the jury was not based upon the validity of the corporate structure of Winn Contractors, Inc., but rather was based upon the fact whether the corporation was used as a sham, a subterfuge and a tool by Hal Hayes, Texas, Inc., for its own benefit and protection. We hold the Court committed no error in submitting this issue to the jury."

Bushman Construction Company v. Conner, 10th Cir. 1962, 307 F.2d 888, illustrates that paper relationships may be telescoped at points other than that between the prime contractor and one of his shadow subcontractors. In Conner, the R.P.R. Construction Company was assumed to have had a valid subcontract with the prime contractor on a military housing project at the Air Force Academy at Colorado Springs. R.P.R., in turn, by assumed valid contract, subbed a portion of its work under its subcontract with the prime contractor to Conner.

Conner, however, in that case, as in the cases before us, needed financial assistance. Conner also was unable to furnish the bond required on the Air Force Academy job. Conner therefore entered into an arrangement with Bushman not dissimilar in substance to the deal Conner made in the cases before us, except in our cases no bonds were either required or furnished to cover Conner's work.

In substance, it was agreed between Conner and Bushman that the latter would advance the money to pay the bills and would receive the progress payments. It was also agreed that if the job was completed under the price of the subcontract, Conner would get half the difference between receipts and payments. In that case, as in the cases before us, Conner had no money in the job and had no real control of any money put up by others.

That case did not involve any actions on any bonds but the facts were so clear as to what sort of contractual relationship existed between Conner and Bushman that, on appeal, the parties agreed that a joint venture existed. Had labor or materials been supplied at Bushman's request, we think it would be clear that no court would be so unrealistic as to hold that such a supplier stood in a too remote relationship from the prime contractor to be outside the protection of a government bond.

There is no real dispute about the facts in the cases before us. Defendants contend that the paper tiers of contractual relationships should control. They contend that we should determine that S. S. Silberblatt was the prime contractor; that Sterling Brukar, Inc., was its subcontractor; that Sterling Brukar, Inc., entered into a valid subcontract with W. S. Conner; and that plaintiffs, who contracted with Conner, therefore stand in a too remote position to recover on the bond.

The difficulty with defendants' position is that Sterling Brukar, Inc., did not in fact take from and perform a specific.

part of the labor or material requirements of the original contract in a manner consistent with the established usage in the construction industry, within the meaning of a "subcontractor" as defined either in the Capehart bond or in the Miller Act as explained in MacEvoy (l. c. 108–109 of 322 U.S., 64 S.Ct. 890).

It is, of course, true that certain moneys were routed through the corporate books of Sterling Brukar, Inc., but that corporation had no money or risk in the "contract" it allegedly "negotiated." The alleged subcontract was not even a paper contract. It existed only in the mind of the joint president of the two family corporations. It was never reduced to writing and was but a creation of convenience of one man, S. S. Silberblatt, who supposedly acted simultaneously for both corporations. We hold that such a relationship is not the sort of contractual relationship legally intended to limit liability on a bond required by federal law.

A second difficulty with defendants' position on the undisputed facts is that the relationship between Sterling Brukar, Inc., and Conner, even on the peculiar paper document executed prior to the actual awarding of the prime contract to S. S. Silberblatt, Inc., did not make Conner a "subcontractor" within either the definition of the Capehart bond or within the meaning of the Miller Act as construed by MacEvoy. Under the well known practice and usage of the construction industry, it can not be said that Conner, as a "subcontractor," actually took a specific portion of the work to perform. The stipulated facts demonstrate that the parties involved merely made a deal under which Conner, without any real financial responsibility, stood a chance to share the difference between the payments that would be received by the prime contractor for the portion of the work that Conner was supposed to do, and the cost of that work which would be borne by moneys furnished by persons other than Conner.

Legally, such an arrangement could well be labeled a "joint venture;" in the construction industry such deals are sometimes called just that and, on other occasions, they are not infrequently referred to as "participation" agreements.

For an illustration of the latter construction industry vernacular, see the verbal agreement between Bushman and Conner eventually reduced to writing that was involved in the Bushman case. It is reproduced in footnote 2 on page 890 of 307 F.2d. In that case, Conner and Bushman agreed that they would "participate" in Conner's subcontract with R.P.R.

In that case it is clear that R.P.R. was truly looking to Conner for performance, including the furnishing of a subcontractor's bond. In the cases before us, however, the Silberblatt organization knew from the outset that Conner could not possibly perform on his own financial ability and the agreement between them accurately reflected that fact. Even on paper, Sterling Brukar, Inc., was to be the banker for the work that was to be performed by Conner, although the other facts clearly establish that Sterling Brukar, Inc., was acting only as a shadow for S. S. Silberblatt, Inc., in making that financial commitment. S. S. Silberblatt, Inc., through its president, knew exactly who was financially responsible from the outset and defendant bonding company, of course, is presumed to have had that same knowledge.

Under the facts we must find that no real tier of the type of subcontract or the sort of contractual relationships within the meaning of either the definition in the Capehart bond or within the meaning of the proviso in Section 2(a) of the Miller Act, as explained by MacEvoy, was established by the relationship that in fact existed either between S. S. Silberblatt, Inc., and Sterling Brukar, Inc., or by the relationship that in fact existed between those two corporations (or either of them) and Conner. We find that both of those tiers, as a matter of law, must be telescoped. It therefore follows that plaintiff's actual relationship is not too remote to deny them protection under the bonds. We so hold.

Specifically, we find and determine the issues stipulated by the parties in favor of the plaintiffs and direct that plaintiffs' counsel prepare an appropriate formal order pursuant to Rule 42(b) of the Federal Rules of Civil Procedure for presentation at the scheduled final pre-trial conference on September 17, 1964. The proposed order shall be submitted to counsel for the defendants for approval as to form prior to that time.

For purposes of the record, what we have said in this memorandum shall serve as our findings of fact and conclusions of law. In addition we indicate for the record that we approve and accept all of plaintiffs' suggested findings of fact, except paragraphs 12 and 13, relating to the alleged subcontract between Sterling Brukar, Inc., and Conner. We believe what we have had to say concerning that document, executed as it was before the prime contract was even signed, is more realistic than the findings suggested by plaintiffs in those two paragraphs.

Plaintiffs' suggested conclusions of law are generally consistent with the conclusions of law we have made. We believe that what we have said above makes it unnecessary to do more than indicate our general concurrence with those suggested conclusions of law.

Some of defendants' suggested findings of fact, although quite irrelevant to our view of the case, are clearly supported by the record. We do not believe that it is necessary to designate those particular paragraphs. Nor do we believe that clarity requires that we expressly reject defendants' suggested findings that are obviously inconsistent with our determination of the facts as above stated. We therefore, for purposes of the record, generally reject all of defendants' suggested findings of fact and expressly and specifically reject each of defendants' suggested conclusions of law.

For the reasons stated, and pursuant to paragraph 3 of the Stipulation, plaintiffs' motion for partial summary judg-ment under Rule 42(b) should be and is hereby sustained. As above indicated, our formal order will be entered at the scheduled final pre-trial conference.

It is so ordered.