**402**

FIDELITY AND DEPOSIT COMPANY OF MARYLAND and L. E. Dixon Company, Appellants,

v.

Van HARRIS, an individual, doing business as Harris & Sons, Appellee.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND and L. E. Dixon Company, Appellants,

v.

PARAMOUNT TRUCK RENTAL, INC., and Van Harris, an individual doing business as Harris & Sons, Appellees.

PARAMOUNT TRUCK RENTAL, INC., Appellant,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND and L. E. Dixon Company, Appellees.

Nos. 20121, 20122.

United States Court of Appeals Ninth Circuit.

March 29, 1966.

James W. Baldwin, Robert K. Worrell, Andrew J. Nocas, of Thelen, Marrin, Johnson & Bridges, Los Angeles, Cal., for appellants.

Van Harris, in pro. per.

Richard H. Floum, of Greenberg & Glusker, Beverly Hills, Cal., for appellee.

Before CHAMBERS and JERTBERG, Circuit Judges, and THOMPSON, District Judge.

THOMPSON, District Judge.

The United States, acting through the National Aeronautics and Space Admin-

istration, on December 22, 1961, entered into a written contract with California Institute of Technology (CIT) under which CIT agreed to operate the Jet Propulsion Laboratory at Pasadena, California, and to furnish all the scientific, engineering, technical and other personnel, labor and services for the management and operation thereof. The agreement provided, in part, that CIT "may, when authorized by Task Orders or Task Order Amendments, enter into subcontracts for the construction of facilities authorized by approved Construction of Facilities Projects." Pursuant to such a Task Order, on June 18, 1962, CIT entered into a written agreement with L. E. Dixon Company whereby Dixon undertook to construct the Central Engineering Building at the Jet Propulsion Laboratory according to the plans and specifications therefor. As required by the agreement, Dixon furnished a bond with Fidelity and Deposit Company of Maryland as surety for the payment in full of the claims of all persons performing labor upon or furnishing materials to be used in the construction of the building. The United States and CIT are named as joint obligees on said bond.

In anticipation of the contract, Dixon had negotiated with subcontractors and on June 8, 1962, Van Harris, doing business as Harris & Sons, submitted a letter-bid to Dixon covering certain site clearance, grading, excavating and backfilling work required by the construction contract. On or about June 18, 1962, Dixon prepared and sent to Van Harris a proposed written subcontract for the performance of this work, and on June 20, 1962, Harris returned the subcontract to Dixon with a covering letter. Relevant portions of the June 8 letter, the June 18 subcontract and the June 20 letter are quoted in the footnote.[1]

On or about June 20, 1962, Harris entered into a written agreement with An-

---

1. June 8, 1962 letter-bid, Harris to Dixon (Ex. 6):

"Pursuant to our conversations, it is our intention to perform all site clearance and demolition, all heavy machine excavation—back-fill, compaction and grading to 1/10th.

"We exclude handwork, small machine trenching—trimming and compaction, engineering, testing and temporary fences.

"The above will be accomplished in two move-ins—the first at the beginning of this project and the second when the footings and foundations are in and we can accomplish exterior back-fill, compaction and grading.

"These sections will be performed in one continuous operation and pursued diligently until their completion."

June 18, 1962 subcontract (Ex. 3):

"DESCRIPTION OF WORK

"Furnish all labor, material and equipment, and perform all work necessary to complete DEMOLITION, ROUGH GRADING, EXCAVATING, FILLS & BACKFILLING, all as shown on the drawings, defined in the specifications, and as more particularly defined under Spec. Part IV, Div. 1; Part IV, Div. 2; Part V, Div. 1 and including all applicable work as defined in original alternate bid items 1–8 incl., 11 and 12.

"Special Conditions: The removal of 30″ storm drain lines as shown on the drawings to be included. The removal from the site of excess earth resulting from hand excavation and fine grading to be a part of the work of this agreement.

"The excavation and filling of small footings and including hand trimming, fine grading for slabs, hand fills, engineering, testing and temporary fences to be by others."

June 20, 1962 letter, Harris to Dixon (Ex. 5):

"In the sub-contract—Job #881, forwarded by your company to us, this date, the third paragraph of our June 8th letter of intent has been omitted.

"This paragraph reads, 'The above will be accomplished in two move-ins—the first at the beginning of this project and the second when the footings and foundations are in and we can accomplish exterior back-fill, compaction and grading', and as you and I had discussed this at length—agreeing to these methods—I assume the omission was inadvertence.

"I also explained that for the furtherance of its completion it would be necessary to have one sub-contractor on this project and as there were no objections, I have made arrangements for this.

"With this letter attached to and a part of this sub-contract, I inclose, herewith, the signed yellow copy as requested."

drew Franklin Yost whereby Yost undertook, for a lesser sum than Harris was to receive, the performance of all the work encompassed by the presumed agreement between Harris and Dixon. Subsequently, Yost contracted with Paramount Truck Rental, Inc. to rent from Paramount certain heavy construction equipment on an operated basis to perform a part of the work.

Work on the project commenced about July 1. Harris appeared at the job site, introduced Yost and his foreman, McFarland, to Dixon's General Project Manager, and assisted in getting the site clearance, grading and excavation work lined out and underway. Thereafter, Harris was at the project site from time to time but spent most of his time on other jobs. None of the actual site clearance, grading and excavation work was performed by Harris or by anyone employed by him.

On July 20, 1962, Harris submitted a bill to Dixon for $7,213.50 to cover the completion of the first thirty-five per cent of the work, and payment was made by Dixon less ten per cent retention about August 10, 1962. On August 20, 1962, Harris submitted a bill for an additional twenty per cent of the work. This was never paid. Shortly thereafter, disputes arose in the course of which Dixon charged Harris with having subcontracted the work in violation of the agreement; with having failed to perform certain work relating to small footings and trenches required by the agreement; and with having excavated a basement, leaving a wall twenty-five to thirty feet in depth which was dangerously steep and improperly sloped in violation of safety regulations. Dixon refused to make any further payments to Harris unless full and complete releases were obtained from Paramount and Yost. Harris countered with the contentions that his right to subcontract the job was a part of the agreement; that the small footings and trenches consisted of handwork or small machine work not required under the agreement; that any defects in performance were the result of improper engineering by Dixon; and that Dixon had no right to insist upon releases. Because of the impasse, Harris, Yost and Paramount withdrew from the project.

In October, Dixon needed some equipment immediately and negotiated directly with Paramount for equipment which was furnished and the rental for which has not been paid in the amount of $431.09, which sum is a part of Paramount's total claim for $8,730.87.

In due course, Yost and Paramount gave the written notices required by 40 U.S.C. 270b to Dixon and Fidelity, and thereafter brought actions under the Miller Act. Dixon filed a third party complaint against Harris in one action and a counterclaim in another alleging Harris' breaches of the subcontract, damages in the amount of $37,290, and Harris' obligation to indemnify Dixon for any claims of Yost and Paramount which Dixon might be required to pay.

The cases were consolidated for trial. Shortly prior to trial, Yost was adjudicated a bankrupt and the issues with respect to Yost were settled with the Trustee in Bankruptcy and thereafter were dismissed with prejudice. The case proceeded to trial on the Miller Act claim of Paramount against Dixon and Fidelity and on Dixon's cross-complaint against Harris for damages for breach of contract. Harris appeared and defended in his own proper person. The Pre-Trial Order entered September 28, 1964, approved by Harris and the attorneys for all the parties, admitted that on or about June 18, 1962, Dixon and Harris entered into a written subcontract whereby Harris agreed to perform all site clearance and demolition work at the proposed Jet Propulsion Laboratory site with certain exceptions set forth in said written subcontract. At the conclusion of the trial and on Harris' motion, the Court permitted the Pre-Trial Order to be amended to include as issues of fact and law "(1) that Harris was prevented from performance of any contract with Dixon by Dixon; and (2) that there was no valid

written contract between Dixon and Harris."

In its Memorandum Opinion which encompasses its Findings of Fact, the District Court rendered judgment in favor of Paramount against Dixon and Fidelity for the sum of $8,730.87, and the Court rendered judgment in favor of Harris and against Dixon on the cross-complaint by Dixon for damages for the alleged breaches by Harris of the purported subcontract.

Dixon and Fidelity have appealed the judgment in favor of Paramount on its Miller Act claim. Dixon has appealed the judgment in favor of Harris on the breach of contract claim, and Paramount has appealed the refusal of the District Court to include attorney fees in the judgment in Paramount's favor under the Miller Act.

■ The trial court, which found in its Memorandum Opinion "that there was no meeting of the minds between Harris and Dixon and Dixon never accepted Harris' counteroffer", concluded that "there was no express contract between Harris and Dixon." We think the proper solution of all issues presented on this appeal is governed to a great extent by the sustainability of these findings. Dixon and Fidelity contend that if Harris' letter of June 20, 1962 accompanying the return of the signed subcontract was a counter-offer, Dixon's actions in proceeding to perform was an acceptance of the counter-offer, although, admittedly, there was no express acceptance by conversation, letter or otherwise. Beatty v. Oakland Sheet Metal Supply Co., 1952, 111 Cal. App.2d 53, 244 P.2d 25, is distinguishable because there was evidence of an express acceptance of the counter-offer; and Fidelity and Casualty Co. of New York v. Fresno Flume & Irrigation Co., 1911, 161 Cal. 466, 119 P. 646, 37 L.R.A., N.S., 322, also cited by Appellants, involved an insurance policy signed by the insurer but not by the insured, as is customary, and is of little help. The footnote quotation from the Beatty case properly summarizes the California law.[2] See Annotation, 135 A.L.R. 821.

2. "It is, of course, the rule that if a counter proposal is accepted by the original offeror, a binding contract is concluded. 6 Cal.Jur. p. 63. *The acceptance, however, must be* an unequivocal assent to the offer, although it is not essential that the identical language be repeated. As is said in Ennis Brown Co. v. W. S. Hurst & Co., 1 Cal.App. 752, 761, 82 P. 1056, 1059: '*Any form of expression showing clearly an intention to accept on the terms proposed— i. e., a consent to the same subject-matter in the same sense—would be sufficient*, if not coupled with some new condition * * *.' Grimes v. Nicholson, 71 Cal.App.2d 538, 162 P.2d 934; Grant v. Long, 33 Cal.App.2d 725, 92 P. 2d 940. And in Grant v. Long, 33 Cal. App.2d 725, 736, 92 P.2d 940, 947, it is said that: 'While an express contract is one, the terms of which are stated in words (Treadwell v. Nickel, 194 Cal. 243, 228 P. 25), one party may use the words and the other may accept, either in words or by his actions or conduct. Lane v. Superior Court, 104 Cal.App. 340, 285 P. 860.' In Grimes v. Nicholson, 71 Cal. App.2d 538, 541, 162 P.2d 934, 935, the court said that, 'Respondent's statement of the terms upon which he would perform the work, followed by appellant's answer "O.K." and "O.K. we will go to work," constituted a valid and binding contract between the parties whereby appellant agreed to the conditions as stated by respondent.' Conduct of the offeree may, under proper circumstances, constitute acceptance. In Fidelity etc. Co. v. Fresno Flume etc. Co., 161 Cal. 466, 473, 119 P. 646, 648, 37 L.R.A.,N.S., 322, the court said: 'The receipt and acceptance by one party of a paper signed by the other, and purporting to embody all the terms of a contract between the two, binds the acceptor, as well as the signer, to the terms of the paper. 9 Cyc. 260, 391; Civ.Code, § 1589; Watkins v. Rymill, L.R. 10 Q.B.D. 178, 188.' Also in Dallman Supply Co. v. Smith-Blair, Inc., 103 Cal.App.2d 129, 132, 228 P.2d 886; this court followed the rule so enunciated, setting out the language above quoted and citing in support thereof Frankfort etc. Co. v. California Artistic Metal & Wire Co., 28 Cal.App. 74, 82, 151 P. 176; Remsberg v. Hackney Manufacturing Co., 174 Cal. 799, 802, 164 P. 792; Barlow v. Frink, 171 Cal. 165, 170, 152 P. 290; Fidelity etc. Co. v. Fresno Flume etc. Co., 161 Cal. 466, 473, 119 P. 646, 37 L.R.A.,N.S., 322; Bloom v. Hazzard, 104 Cal. 310, 37 P. 1037; California Jewelry Co. v. Provi-

Appellants' reliance upon the conduct of the parties as evidence of acceptance of the counter-offer is misplaced. True, the work of site clearance and excavation commenced and a progress billing was submitted by Harris and paid by Dixon, presumably in accordance with the contract, but which contract? This conduct would have been the same whether performed under the written subcontract dated June 18, 1962 (Ex. 3), as asserted by Dixon, or pursuant to the written subcontract as explained by the letter of June 8, 1962 (Ex. 6), and the counter-offer letter of June 20, 1962 (Ex. 5). This conduct is equivocal and justifies no inference of acceptance of a particular contract. Later, in August and September, when disputes arose, the evidence demonstrates with clarity that Dixon deemed Harris bound by the written subcontract standing alone, while Harris differed. Accordingly, Dixon objected to the Yost subcontract as being unauthorized, and Harris said it was covered by the June 20 letter; Dixon attempted to call Harris back to the jobsite for more than two "move-ins", and Harris said such expense was avoided by the June 8 and June 20 letters; Dixon complained of Harris' failure to perform certain small excavations and Harris said these were not within the scope of his work, alluding to the references to "handwork", "small-machine trenching" and "heavy machine excavation" in the June 8 and June 20 letters; Dixon refused to make the second progress payment unless full releases were obtained from Yost and Paramount, and Harris objected because there was no such requirement in his contract.

■■ We deem the foregoing sufficient to show that Dixon's conduct was not so unambiguous as to require an inference of assent to the counter-offer made by Harris in his letter of June 20, 1962. The alleged acceptance was not an unequivocal assent to the counteroffer or a form of expression showing clearly an intention to accept on the terms proposed (See Fn. 2 supra). Accordingly, the District Judge's finding that no subcontract was consummated between Dixon and Harris cannot be said to be clearly erroneous, and must be affirmed under the established rule of appellate review. F.R.Civ.P. 52(a); United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

The foregoing conclusion disposes of Dixon's appeal from the judgment denying recovery on account of Harris' alleged breaches of the subcontract. There was no contract which imposed obligations on Harris to perform any particular scope of work for a stated price. To the extent that work was performed by him at Dixon's request, he was entitled to compensation for the reasonable value thereof on an implied contract, but Harris made no claim that anything was due him.

■ With respect to the judgment for Paramount against Dixon and Fidelity, the latter contend that Paramount is a "fifth-tier", or, at best, "fourth-tier" subcontractor or equipment supplier who is disqualified from Miller Act (40 U.S.C. 270) protection by the decision in Clifford F. MacEvoy Co. v. United States, etc., 1944, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163.[3]

dent Loan Ass'n, 6 Cal.App.2d 506, 510–511, 45 P.2d 271.

"When Schechtman handed to Mrs. Beatty the written terms of his offer to sell, she said to him that the offer 'was entirely satisfactory'. She took the writing with her, and based her written offer to Persico on the terms which it contained. Schechtman knew as is hereinafter more fully set forth that Mrs. Beatty intended to sell the steel to Per-sico. She told him that his offer was satisfactory, she took the writing with her, and she acted on it as she had told him she was going to act. It is difficult to perceive how a clearer case of acceptance would be established." [Italics added.]

3. "The proviso of Section 2(a), which had no counterpart in the Heard Act, makes clear that the right to bring suit on a payment bond is limited to (1) those ma-

First, Appellants argue that Dixon was not the contractor within the meaning of the Miller Act but that California Institute of Technology was the prime contractor which alone was in privity with and owed a contractual duty to the United States. It is unnecessary for us to do more, in refutation of this argument, than to approve the reasoning and conclusions of Judge Kilkenny and Judge Carter in their respective opinions in United States for Use of West Pacific Sales Co. v. Harder Industrial Contractors, Inc. (D.Or.1962), 225 F.Supp. 699; and United States for Use of Gamerston & Green Lumber Company v. Phoenix Assurance Co. of New York (N.D.Cal. 1958), 163 F.Supp. 713. The Central Engineering Building of the Jet Propulsion Laboratory was clearly a public building or a public work of the United States within the meaning of the Miller Act and Dixon was the prime contractor for the construction of that building, whatever the words one may choose to employ to characterize the position of CIT in the contractual chain.

■ Secondly, Dixon argues that if it is the prime contractor, still Harris was its subcontractor, Yost was Harris' subcontractor and Paramount, as a renter of equipment to Yost, is not secured by the Miller Act bond. Paramount suggests that this is still an open question in the Ninth Circuit and that we should approve the interpretation of the MacEvoy decision followed in McGregor Architectural Iron Co. v. Merritt-Chapman & Scott Corporation (1957, M.D. Penn.), 150 F.Supp. 323. The short statement of the rule there suggested is that any subcontractor, no matter how far down the line his contract was negotiated, who actually performs on the project site an integral part of the work

required by the prime contract is entitled to Miller Act protection. We decline to adopt this rule because we cannot sustain it as a fair interpretation of the rule announced by the Supreme Court which, in turn, was based upon a reasonable interpretation of the statutory language and Congressional intent. Recovery under the Miller Act is limited to those who have a direct contractual relationship, express or implied, with the prime contractor or a direct contractual relationship, express or implied, with a subcontractor of the prime contractor. See: Elmer v. United States Fidelity and Guaranty Co., 275 F.2d 89 (5 Cir. 1960); Aetna Insurance Co. v. Southern, Waldrip & Harvick, 198 F.Supp. 505 (N.D. Cal.1961); United States for the use and Benefit of Whitmore Oxygen Co. v. Idaho Crane & Rigging Co., 193 F.Supp. 802 (E.D.Idaho 1961); United States for Use and Benefit of Jonathan Handy Co., Inc. v. Deschenes Construction Co., Inc., 188 F.Supp. 270 (D.Mass.1960); United States for Use and Benefit of Newport News Shipbuilding & Dry Dock Co. v. Blount Bros. Construction Co., 168 F. Supp. 407 (D.Md.1959).

Although the rule appears on its face to be a mechanical and somewhat sterile application of a statute designed for the protection of laborers, mechanics and materialmen, it is justified by its clarity, conciseness and understandability and eliminates many doubts and problems which would otherwise arise. It is easy to say in the abstract that any subcontractor who actually performs on the project site an integral part of the prime contract is covered by the bond, but the imaginable difficulties in application of the rule are manifold. For example, what would be the position of an equipment concern which delivers specially

terialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-subcontractors who, lacking express or implied contractual relationship with the prime contractor, have direct contractual relationship with a subcontractor and who give the statutory notice of their claims to the prime contrac-

tor. To allow those in more remote relationships to recover on the bond would be contrary to the clear language of the proviso and to the expressed will of the framers of the Act. Moreover, it would lead to the absurd result of requiring notice from persons in direct contractual relationship with a subcontractor but not from more remote claimants."

fabricated equipment on order of a sub-subcontractor to be installed by others but undertakes to loan an expert to su-pervise the installation? In our opinion, the virtues of certainty and uniformity in the law advanced by the MacEvoy interpretation of the Miller Act outweigh the alleged benefits of the enlarged scope of bond protection afforded by other interpretations of the Act and other interpretations of the language and holding of the MacEvoy case.

So, it might appear that the judgment for Paramount must be reversed and this would be so if it were not for the finding that Harris had no express contract with Dixon. Under the undisputed facts and findings in this case, no one has been paid by the prime contractor, Dixon, for the equipment supplied by Paramount. All the equipment rentals here involved were incurred after July 20, 1962, and were not included in Harris' first progress billing which Dixon paid. The reasonable value found by the trial court from undisputed evidence of the benefit so conferred is the amount of the judgment rendered.

These facts require us to interpret the statutory language [40 U.S.C. 270b] "any person *having direct contractual relationship* with a subcontractor but no *contractual relationship express or implied* with the contractor furnishing said payment bond shall have a right of action." [Emphasis added.] Do these facts create an implied contract between Paramount and Dixon? It seems apparent that, wholly apart from the Miller Act, California law will justify recovery against Dixon on a contract implied in law, that is, a quasi-contractual obligation "arising without reference to the assent of the obligor, from the receipt of a benefit, the retention of which is unjust, and requiring the obligor to make restitution." 42 Cal.Jur.2d 796. Quasi-contractual obligations "presuppose the acceptance and retention of benefits by a person under circumstances making it inequitable for the benefits to be retained without payment of their reasonable value." (Idem.) See: Lazzarevich v. Lazzarevich, (1948), 88 Cal.App.2d 708, 200 P.2d 49; Harriman v. Tetik, 1961, 56 Cal.2d 805, 17 Cal.Rptr. 134, 366 P.2d 486; Kessler v. Sapp, 1959, 169 Cal.App. 2d 818, 338 P.2d 34.

Such liability is not in reality contractual in character, but is imposed in the absence of any privity between the parties or circumstantial evidence of contractual assent to prevent unjust enrichment. Bayne v. United States, 1876, 93 U.S. 642, 23 L.2d 997; 46 Am.Jur. 99–101.

But the two reported cases we have found which interpret the meaning of implied contract, as used in the Miller Act, have reached the conclusion that it encompasses only contracts implied in fact, that is, contracts based on assent inferred from all the facts and circumstances. In United States ex rel. Hargis v. Maryland Casualty Co. (S.D.Cal.1946), 64 F.Supp. 522, the Court said:

"Much speculation has been indulged in by law writers and courts on the distinction between implied contracts in law and implied contracts in fact. Many have insisted that contracts implied in law are, in reality, constructive or quasi contracts. But all the authorites seem to agree that when the words 'implied contract' occur in a statute, the reference is to an actual contract inferred from the circumstances, conduct, acts or relations of the parties, showing a tacit understanding. See, Baltimore & Ohio R. v. United States, 1923, 261 U.S. 592, 598, 43 S.Ct. 425, 67 L.Ed. 816; Klebe v. United States, 1923, 263 U.S. 188, 44 S.Ct. 58, 68 L.Ed. 244; G. T. Fogle & Co. v. United States, 1943, 4 Cir., 135 F.2d 117, 120; 17 C.J.S., Contracts, § 4, sub-secs. a and b; Restatement; Contracts, 1932, Sec. 5.

"The use of this term in the statute under consideration means that a person furnishing labor and materials to a subcontractor can recover on the bond, without the ninety day notice, if although not armed with an express contract, he can claim a contract by impli-

cation. In the last analysis, the legal effect of both contracts is the same. For the distinction lies merely—to use the words of the Restatement; Contracts, Sec. 5(a)—'in the mode of manifesting assent.' And so, when, as in the case before us, a contractor not only agreed in writing to pay certain obligations which the subcontractor might incur in the performance of his subcontract, but actually did so, we have, if not a contract made directly for the benefit of a third party, at least, an implied contractual relationship which calls for recovery on the bond without notice. For, using the test of the older cases, 'privity of contract' exists between the contractor and such persons. Woods v. Ayres, 1878, 39 Mich. 345, 33 Am.Rep. 396, the leading case on the subject."

■ The same conclusion was reached in United States for Use of Bruce Co. v. Fraser Constr. Co. (W.D.Ark.1949), 87 F.Supp. 1. A quasi-contractual obligation to prevent unjust enrichment is not included within the scope of implied contracts as the term is used in the Miller Act.

■ In the instant case, we cannot endorse Paramount's contention that the fact that in October (after Harris, Yost and Paramount had terminated performance of the presumed Harris subcontract), Dixon ordered equipment directly from Paramount, justifies an inference that all prior equipment rentals were incurred upon the request of Dixon with an implied promise to pay. The evidence clearly shows that Paramount dealt with Yost, who had a subcontract with Harris, who had a putative subcontract with Dixon. Also, the fact that Dixon's Project Manager had dealings with Paramount's foreman and with Yost throughout their performance of their work does not justify an inference that Dixon had contracted directly with Yost or Paramount. If this inference were permissible, every subcontractor or material supplier who received instructions, information or guidance from the prime contractor would be held to have a direct contractual relationship with the prime contractor. There is an obvious distinction between dealings relating to the performance of his work with a person whose relationship to the prime contractor is too remote for Miller Act coverage, and conversations or conduct from which an inference of a promise to pay would be warranted.

■ The trial court, in the Memorandum Opinion, stated: "Thus, when Yost and Paramount commenced and performed work on the job site they did so under an implied contract for reasonable value for services rendered and equipment used, whether they did so under an implied contract running from Dixon to them, or under an implied contract running from Dixon to Harris and to Yost as Harris' assignee." Accordingly, Paramount argues that we should, in effect, telescope the subcontracts and find that Harris was only a "paper subcontractor" to be ignored in the chain. We have no quarrel with the cited decisions where this has been done in cases involving subterfuge, collusion between the prime contractor and subcontractor or circumstances indicating the interposition of straw men, presumably for the purpose of insulating the prime contractor and surety company from extensive Miller Act liability. Cf. Fine v. Travelers Indemnity Co. (W.D.Mo.1964), 233 F.Supp. 672; United States, etc. to the Use of Acme Furnace Fitting Co. v. Fort George G. Meade (D.Md.1960), 186 F.Supp. 639; Continental Casualty Co. v. United States etc., 5th Cir. 1962, 308 F.2d 846. The argument has superficial appeal in this case where it has been found that Harris did not in fact have an express subcontract for a particular portion of the work. Because Harris was working only on a quantum meruit basis for the reasonable value of work done, there is an inclination to consider him as Dixon's agent in the sub-delegations of the work to others. We are fearful, however, to rely upon such a principle in view of the evident tendency it would have to destroy the MacEvoy rule as we have adopted it. It would be pure fiction to characterize

Harris as an agent of Dixon under these circumstances. The facts are that he had a putative subcontract with Dixon, which all concerned deemed genuine at the commencement of the work that he sub-let the contract to Yost at a profit, and Yost in turn contracted with Paramount. Harris throughout was acting for himself and not as agent of anyone. Nor are we willing to characterize him as a "paper subcontractor" solely because he subcontracted all the work required of him under his putative subcontract with Dixon. Under the authorities cited to us, there must be circumstances of subterfuge, collusion or interposition of straw men to warrant elimination of a party in a chain of subcontracts.

The net result of this discussion is that the only contract, express or implied, between Paramount and Dixon upon which Dixon and Fidelity are liable under the Miller Act is the obligation to pay $431.09 for equipment furnished in October upon Dixon's direct request to Paramount.

The remainder of the judgment, $8,298.78, cannot be recovered under the Miller Act inasmuch as Paramount's relationship is too remote in the chain of subcontracts. This sum ($8,298.78), nevertheless, is properly included in the judgment against Dixon upon the quasi-contractual concept of unjust enrichment supported by the evidence, the findings and the law to which we have alluded. True, such a quasi-contractual action would not normally lie within federal jurisdiction, but in this situation where the non-federal cause of action is inseparably bound with and arises from the same facts which support a substantial federal cause of action, the Court will proceed to a decision of all issues inasmuch as there is no valid reason to have double litigation of an issue which has been tried and can as readily be settled now. Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148.[4] Cf. United States to the Use of Claude C. Wood Co. v. General Insurance Company of America, N.D. Cal.1965, 247 F.Supp. 543.

Paramount has appealed for attorney fees under the Miller Act. The Miller Act recovery has been reduced to $431.09 and is too insubstantial in relation to the case as a whole to persuade us that the assignment of error now deserves our attention on this appeal.

The judgment against L. E. Dixon Company for $8,730.87 (which includes $431.09) is affirmed. The judgment against Fidelity and Deposit Company of Maryland is reduced to $431.09, together with interest on said sums at the rate of 7% per annum from October 11, 1962 until paid.

---

4. "The distinction to be observed is between a case where two distinct grounds in support of a single cause of action are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the nonfederal ground; in the latter it may not do so upon the nonfederal cause of action."